[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 14, 2003
THOMAS K. KAHN
CLERK

No. 02-14191

D. C. Docket No. 00-00469-CV-J-12

GEORGE A. WILLIAMS,
MICHAEL A. PERRYMAN, et al.,

Plaintiffs-Appellees,

versus

CONSOLIDATED CITY OF JACKSONVILLE,
RAYFIELD ALFRED,
Fire Chief, in his individual and
official capacities,

Defendants-Appellants.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

**(August 14, 2003)**

Before MARCUS and WILSON, Circuit Judges, and RESTANI[*], Judge.

WILSON, Circuit Judge:

_____

[*]Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.

This case arose out of Jacksonville Fire Chief Rayfield Alfred's decision not to create four new roving captain positions in the Fire Captain Rescue Division of the Jacksonville Fire and Rescue Department as proposed by a subordinate official. The plaintiffs, George A. Williams, Michael A. Perryman, Michael B. Price, and Nolan A. Sauls,[1] are four white lieutenants in the fire department who were passed over for promotion as a result of Chief Alfred's decision not to create the new positions. Alleging that Chief Alfred's decision amounted to race and gender discrimination, they filed a complaint pursuant to 42 U.S.C. §§ 1981 and 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and the Florida Civil Rights Act of 1992 (FCRA), Fla. Stat. §§ 760.01–760.11, against the Consolidated City of Jacksonville and Chief Alfred in his individual and official capacities (collectively the defendants). After the district court denied the defendants' motion for summary judgment based upon qualified immunity as to the claims against Chief Alfred in his individual capacity, the defendants brought this interlocutory appeal, asserting that Chief Alfred is entitled to qualified immunity.[2] As we find that Chief Alfred is entitled to qualified

---

[1]Sauls died on August 7, 2000, and his estate was substituted as a party in this action.

[2]Although this appeal was brought by the defendants as evinced by their Notice of Appeal, the appeal itself pertains only to the claims brought against Chief Alfred in his individual capacity. Thus, our holding applies only to those claims.

immunity, we reverse and remand this case to the district court with instructions to enter summary judgment in favor of Chief Alfred as to the claims brought against him in his individual capacity.

## BACKGROUND[3]

On November 1, 1995, Chief Alfred, a black man, was appointed by Mayor John Delaney to his current position as the director and chief of the fire department in Jacksonville, Florida. Mayor Delaney recruited Chief Alfred from Washington, D.C., where he previously served as fire chief. Chief Alfred was appointed because the fire department had a history of racism and nepotism and Mayor Delaney wanted to bring someone in from outside of the department to ensure that the department would be run in a race-neutral manner. Significantly, there was no affirmative action plan in place.

As fire chief, Chief Alfred has the authority to create new positions and the responsibility to fill vacancies within the fire department. In so doing, however, he does not enjoy absolute discretion, because his authority to promote within the ranks of lieutenant, captain, and chief in the rescue division is limited to

---

[3]For purposes of this appeal of the district court's denial of qualified immunity to Chief Alfred on summary judgment, the facts are construed "in the light most favorable to the plaintiff[s]," *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002), and "may not be the 'actual' facts of the case," *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

3

promoting from an eligibility list that is generated from a competitive written examination. Indeed, under the rescue division promotion system, which was devised pursuant to the City's contract with the Jacksonville Association of Firefighters, Local 122, an eligibility list is created from the certified results of a race-neutral examination that is administered solely for the purpose of determining who is eligible for promotion and the order in which those candidates will be promoted. To determine the order of promotion, eligible candidates are ranked according to their examination scores, and Chief Alfred must promote according to that order. In other words, when a vacancy opens or a new position is created, the next highest person on the eligibility list is promoted to that position. Once an examination is certified, the eligibility list is valid for two years, at which time it expires and a new examination is administered and a new eligibility list is generated. Thus, all candidates who remain on an eligibility list when it expires, but who wish to be considered for future promotions, must retake the examination and undergo the process anew.

In October of 1999, Thomas T. McCrone, the chief of the rescue division, approached Chief Alfred and proposed that he create four new captain positions in the rescue division, known as roving captain positions, and fill them from an eligibility list that was generated in 1997, but was set to expire in approximately

4

nine days.[4]  At that time, the plaintiffs were the next four candidates on the 1997 eligibility list; thus, if Chief Alfred had agreed to create the new positions, the plaintiffs would have been promoted to the new positions.[5]  After considering Chief McCrone's written proposal, however, Chief Alfred told Chief McCrone that he looked over the existing eligibility list and that he thought the concept of the positions and the justification for them were good, but that he preferred to establish a new list.[6]  Allegedly, Chief Alfred wanted to wait for a new list, because he did not want to promote four white men to the new positions as he already promoted eight white men[7] from the 1997 eligibility list.[8]

---

[4]As the results of the examination were certified on October 14, 1997, the eligibility list was effective until October 14, 1999.

[5]Although they initially were ranked ninth (Williams), tenth (Perryman), eleventh (Sauls), and twelfth (Price), eight lieutenants already had been promoted to captain from the 1997 eligibility list; thus, the plaintiffs were the top four candidates on the list when Chief Alfred considered Chief McCrone's proposal.

[6]The roving captain positions never were created, but, after the 1997 eligibility list expired, a number of new captain vacancies arose in the rescue division and each of the three surviving plaintiffs, during the years 2000 and 2001, was appointed to one of those vacancies on a provisional basis.  In November of 2001, however, a new exam was given, and a new eligibility list was created; the surviving plaintiffs, who had elected not to retake the exam in 2001, lost their temporary status as captains when the vacancies were filled from the new eligibility list.

[7]One of the eight men was white-hispanic.

[8]Indeed, Chief Alfred's underlying motivation, as understood by Chief McCrone, was articulated in a conversation that he had with Price, in which Chief McCrone told Price why the new positions would not be created.  He explained, "'I have done everything I can do.  It's out of my hands.  Alfred said the next four people on the list do not reflect the diversity of the fire department.'"  Price allegedly responded, "'So basically you're not doing this because we're not black?,'" to which Chief McCrone answered, "'Basically . . . .'  '[I]t's out of my hands.'"

Subsequently, the plaintiffs filed this civil rights lawsuit[9] against the defendants pursuant to §§ 1981 and 1983, Title VII, and the FCRA, alleging that in the absence of a valid affirmative action plan Chief Alfred's decision not to create the roving captain positions amounted to unlawful race and gender discrimination in employment. The plaintiffs asserted that but for their racial or gender identity, "Chief Alfred would have implemented or created the four Roving Captain Rescue Division positions at the time he was requested to do so, and at the time the need for those positions arose, before the eligibility list expired."

In response, the defendants moved to dismiss the discrimination claims, asserting in part that Chief Alfred was entitled to qualified immunity for the claims brought against him in his individual capacity. The district court disagreed, however, finding that the "plaintiffs have alleged facts sufficient to establish

Similarly, on at least two other occasions, Chief McCrone repeated to others in the fire department that Chief Alfred's decision not to create the positions was due to his desire to have a more diversified list. Chief Alfred denied making this statement, however, claiming that his motivation was fiscal and economic and that any diversity concerns merely arose from a desire to promote from a larger, potentially more diverse applicant pool, and Chief McCrone has since recanted his explanation of why Chief Alfred did not create the positions. Accordingly, the district court recognized in its July 3, 2002 order that disputed facts exist as to the motivation behind Chief Alfred's decision not to create the roving captain positions. Nevertheless, as explained previously, for purposes of this interlocutory appeal, we accept the plaintiffs' version of the facts as true and need not determine the validity of the district court's evidentiary finding. *See Lee*, 284 F.3d at 1190.

[9]The complaint we refer to in this opinion is the plaintiffs' Amended Complaint filed on July 21, 2000.

6

entitlement to relief based upon the violation of a clearly established constitutional or federal statutory right." *Williams v. Consol. City of Jacksonville*, M.D. Fla. 2000, __ F. Supp. 2d __ (No. 00-00469-CV-J-12, Nov. 1, 2000) (denying in part the defendants' motion to dismiss the plaintiffs' amended complaint for failure to state a claim upon which relief could be granted and their motion to dismiss the claims brought against Chief Alfred in his individual capacity on qualified immunity grounds and granting dismissal of the plaintiffs' § 1981 claim against the City), *aff'd*, 268 F.3d 1067 (11th Cir. 2001) (unpublished table decision). We affirmed that decision on interlocutory appeal, finding that the plaintiffs stated their cause of action sufficiently. *Williams*, 268 F.3d at 1067. We noted, however, that "[f]urther proceedings will determine whether the Appellant is entitled to qualified immunity." *Id.*

Thereafter, discovery commenced and the defendants moved for summary judgment, arguing, among other things,[10] that Chief Alfred was entitled to qualified immunity. Again, the district court disagreed, finding that Chief Alfred was not entitled to qualified immunity. The district court seemed to base its opinion, in large part, upon its conclusion that our previous opinion affirming its

---

[10]The other arguments raised by the defendants in their motion for summary judgment are not before us on appeal; thus, we do not consider them herein.

denial of the defendants' motion to dismiss barred Chief Alfred from receiving qualified immunity at the summary judgment stage. *Williams v. Consol. City of Jacksonville*, M.D. Fla. 2002, __ F. Supp. 2d __ (No. 00-00469-CV-J-12, July 3, 2002) (denying the defendants' motion for summary judgment).[11] Additionally, the district court stated that qualified immunity was not appropriate, because "Plaintiffs have presented evidence sufficient for a jury to conclude that they are entitled to relief based upon the violation of clearly established constitutional or federal statutory rights as set forth in their Amended Complaint." *Id.* at __. As a result, Chief Alfred brought this interlocutory appeal of the district court's denial of the defendants' motion for summary judgment based upon qualified immunity.

## STANDARD OF REVIEW

We review the district court's denial of a motion for summary judgment based upon qualified immunity de novo, construing the facts "in the light most favorable to the plaintiff[s]." *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). "When that is done, a pure issue of law is created," *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 n.3 (11th Cir. 1996), and "[w]e then answer the legal question of

---

[11]In this order, the district court also addressed the plaintiffs' motion for partial summary judgment and found in favor the plaintiffs, dismissing the defendants' ninth, tenth, eleventh, and thirteenth affirmative and special defenses. As this does not affect the outcome of this appeal, we do not address it further.

whether the defendant[][is] entitled to qualified immunity under that version of the facts," *Lee*, 284 F.3d at 1190 (second and third alterations in original) (internal quotation marks omitted). As we previously stressed in qualified immunity cases, however, "the 'facts', [sic] as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

## DISCUSSION[12]

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting

---

[12]As Chief Alfred's appeal ultimately hinges upon our legal determination of whether he violated a clearly established constitutional right when he declined to create four new roving captain positions, we conclude that we have interlocutory jurisdiction to review the district court's denial of summary judgment on qualified immunity grounds. *See Behrens v. Pelletier*, 516 U.S. 299, 311 (1996) ("[A]n order denying qualified immunity, to the extent it turns on an 'issue of law,' is immediately appealable" (citation omitted).); *Cottrell*, 85 F.3d at 1485 (Interlocutory jurisdiction exists over the denial of a summary judgment motion based upon qualified immunity when "the denial is based even in part on a disputed issue of law."). Moreover, Chief Alfred is not precluded from bringing this appeal interlocutorily by his previous interlocutory appeal of the district court's denial of qualified immunity on a motion to dismiss, *see Cottrell*, 85 F.3d at 1487 n.4 (A defendant is entitled to raise a qualified immunity defense in both a motion to dismiss and a motion for summary judgment, and he may appeal an unfavorable outcome of *both* motions interlocutorily if questions of law exist.), and our decision in that case did not prevent him from raising a qualified immunity defense on summary judgment, because that opinion addressed only whether qualified immunity was appropriate on a motion to dismiss, *see Williams*, 268 F.3d at 1067 (providing that "[f]urther proceedings will determine whether [Chief Alfred] is entitled to qualified immunity"). Accordingly, we have jurisdiction.

9

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In effect, qualified immunity

"allow[s] government officials to carry out their discretionary duties without the

fear of personal liability or harassing litigation, protecting from suit all but the

plainly incompetent or one who is knowingly violating the federal law." *Id.*

(internal quotation marks omitted).

"To receive qualified immunity, the public official must first prove that he

was acting within the scope of his discretionary authority when the allegedly

wrongful acts occurred." *Id.* (internal quotation marks omitted). "If the defendant

was not acting within his discretionary authority, he is ineligible for the benefit of

qualified immunity." *Lee*, 284 F.3d at 1194.[13]

"Once the defendants establish that they were acting within their

discretionary authority, the burden shifts to the plaintiff to demonstrate that

qualified immunity is not appropriate." *Lumley v. City of Dade City*, 327 F.3d

1186, 1194 (11th Cir. 2003). We evaluate whether an official is entitled to

qualified immunity, using a two-part analysis set forth by the United States

Supreme Court. *See Vinyard*, 311 F.3d at 1346. Under that analysis, "'[t]he

---

[13]On this record, it is undisputed that Chief Alfred was acting within his discretionary authority as the director and chief of the fire department when he made the employment decisions at issue. Plainly, he had the ultimate authority to create new positions and to fill vacancies in the department.

threshold inquiry a court must undertake . . . is whether [the] plaintiff's allegations, if true, establish a constitutional violation.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 736 (2002)) (second alteration in original). "If a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Accordingly, we address each of these inquires in turn.

## I. Constitutional Violation

We first must determine whether the allegations underlying the plaintiffs' claims against Chief Alfred in his individual capacity establish a violation of the Equal Protection Clause of the Fourteenth Amendment.[14] *See id.* The Equal Protection Clause[15] ensures a right to be free from intentional discrimination based

---

[14]The plaintiffs argue that "Chief Alfred's conduct amounts to unlawful intentional discrimination in violation of the Constitution and Title VII." Because we are concerned only with whether Chief Alfred is entitled to qualified immunity for the claims brought against him in his individual capacity, however, we limit our analysis to whether Chief Alfred's conduct violated the Equal Protection Clause. *See Smith v. Lomax*, 45 F.3d 402, 403 n.4 (11th Cir. 1995) ("The relief granted under Title VII is against the *employer*, not individual employees whose actions would constitute a violation of the Act" (internal quotation marks omitted).).

[15]The Equal Protection Clause provides, in relevant part, that

[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

11

upon race, *see Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1116 (11th Cir. 2001); *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th Cir. 1991), and gender, *see Downing v. Bd. of Trs. of the Univ. of Ala.*, 321 F.3d 1017, 1022 n.9 (11th Cir. 2003); *Parks v. City of Warner Robins*, 43 F.3d 609, 616 (11th Cir. 1995). Accordingly, we have recognized an equal protection right to be free from employment discrimination, *see, e.g.*, *Thigpen v. Bibb County*, 223 F.3d 1231, 1237 (11th Cir. 2000), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), and we have found various race- and gender-based employment decisions by public officials, including those concerning discipline, promotions, transfers, reclassifications, and termination, in violation of that constitutional right, *see Alexander v. Fulton County*, 207 F.3d 1303, 1313, 1321 (11th Cir. 2000) (affirming a jury verdict of intentional employment discrimination by a black sheriff who made race-based employment decisions concerning white officers "with respect to discipline, promotions, transfers, [and] reclassifications"); *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1064 (11th Cir. 1992) (holding that intentionally discriminatory hiring and firing practices violated the Equal Protection Clause); *Brown*, 923 F.2d at 1478 (recognizing a right under the Equal Protection Clause to be free from termination

U.S. Const. amend. XIV, § 1.

12

because of race).

Here, the plaintiffs allege that Chief Alfred was motivated solely by his desire not to promote four more white men under the 1997 eligibility list when he decided not to create the new positions. *See Yeldell*, 956 F.2d at 1065 (looking to the defendant's underlying discriminatory motivation); *Brown*, 923 F.2d at 1478 n.8 ("[A] plaintiff must show a purpose or intent to discriminate in proving an equal protection violation based on racial discrimination."). Although the action taken by Chief Alfred is significantly different than the types of discriminatory employment actions we formerly found unlawful, we find that, as alleged, it essentially was an intentionally discriminatory race- and gender-based employment decision.[16] Therefore, we hold that a decision not to *create* new

---

[16]Clearly, Chief Alfred knew that by leaving things as they were and not creating the proposed positions, the 1997 eligibility list would expire on a fixed date and a new eligibility list, which *might* yield more diversity, would be generated through race-neutral means for future promotions. In that regard, he argues that our decision in *Allen v. Alabama State Board of Education*, 164 F.3d 1347, 1352–53 (11th Cir. 1999), *vacated on other grounds by* 216 F.3d 1263 (11th Cir. 2000), which he interprets as finding that race-conscious outreach efforts by government officials taken to broaden an applicant pool in a department with a history of racism were lawful if they ultimately disadvantaged no one, supports his actions in this case. Although it is apparent that Chief Alfred was faced with a dilemma, especially in light of the fire department's history of discrimination against minorities and women, we are limited at this stage to the facts as construed in the light most favorable to the plaintiffs. *See Lee*, 284 F.3d at 1190. As such, regardless of how well-intentioned Chief Alfred *might* have been, under *Allen*, his decision still was unlawful absent a valid affirmative action plan. *See* 164 F.3d at 1352–53 (The "strict scrutiny standard is plainly applicable where the government distributes burdens or benefits along racial lines, granting a preference or imposing a penalty to individuals because of their race."); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229–30 (1995) ("[W]henever the government treats any person unequally because of his or her race, that person has suffered an

positions that is based solely upon the race and gender of the next eligible candidates for promotion, in the absence of a valid affirmative action plan, violates the Equal Protection Clause.[17]

## II. Clearly Established Law

As the plaintiffs have established the violation of a constitutional right, our next question is whether, at the time that Chief Alfred made his discriminatory employment decision, the unlawfulness of his actions was "clearly established." *Vinyard*, 311 F.3d at 1349. Indeed, Chief Alfred still "may . . . be shielded from liability for civil damages if [his] actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope*, 536 U.S. at 739 (quoting *Harlow*, 457 U.S. at 818). We undertake this determination "'in light of the specific context of the case, not as a broad general proposition,'" *Vinyard*, 311 F.3d at 1349 (quoting *Saucier*, 533 U.S. at 201), in an effort "'to ensure that before [public officials] are subjected to suit,

_____

injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection.").

[17]In reaching this conclusion, however, we are by no means suggesting that a public official must create new positions merely because a subordinate official expresses a need for the positions and the next eligible candidates are of a particular race or that an employee who is next in line for promotion is somehow entitled to a position before it is created. Instead, we simply are extending our precedent to include the alleged employment action in this case – a decision not to create new positions based solely upon the race and gender of the next eligible candidates.

14

[they] are on notice their conduct is unlawful,'" *Hope*, 536 U.S. at 739 (quoting *Saucier*, 533 U.S. at 206). This does not mean, however, that "the very action in question has previously been held unlawful"; rather, it means only that the "unlawfulness" of the action must have been apparent "in the light of pre-existing law." *Id.* Accordingly, "the salient question . . . is whether the state of the law [at the time of the unconstitutional act] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Id.* at 741; *see Vinyard*, 311 F.3d at 1350 (reiterating "that *fair and clear notice* to government officials is the cornerstone of qualified immunity" (internal quotation marks omitted)).

Such fair warning or "*fair and clear notice* can be given in various ways." *Vinyard*, 311 F.3d at 1350. In some rare cases, for instance, a violation may be so egregious that the Constitution or a statute on its face may be sufficient "to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law*." *Id.* (providing a detailed discussion of this "obvious clarity" situation). More frequently, however, we must turn to case law to make our determination. *Id.* at 1351. While "some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts," more often, the facts are so material to the

15

violation at issue that such generalized principles are insufficient, and we must look to precedent that is factually similar to the case at hand. *Id.*; *see Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) (noting that we may look to "decisions of the Supreme Court, this court, or the highest court of the state in which the case arose" to determine if the law was clearly established). In this case, the Equal Protection Clause on its face was not enough to put Chief Alfred on notice that his actions were unlawful; therefore, we turn to case law to determine whether it was clearly established in 1999 that Chief Alfred's actions were unconstitutional.

"[A] broad principle in case law is [sufficient] to establish clearly the law applicable to a specific set of facts facing a governmental official, [when] it . . . do[es] so 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Vinyard*, 311 F.3d at 1351. As discussed above, we previously recognized a broad "equal protection right to be free from intentional racial [and gender] discrimination." *Brown*, 923 F.2d at 1478; *see also Alexander*, 207 F.3d at 1321; *Yeldell*, 956 F.2d at 1064. Although in some cases we have relied upon that broad equal protection principle to clearly establish the unlawfulness of intentionally discriminatory employment

16

actions, *see Bogle v. McClure*, No. 02-13213, slip op. 2620, 2628 (11th Cir. June

6, 2003); *Alexander*, 207 F.3d at 1321,[18] on the unique facts of this case, that

broad principle did not clearly and fairly warn Chief Alfred that a decision not to

*create* new positions that were proposed by a subordinate official was unlawful,

*see Vinyard*, 311 F.3d at 1351–52 (noting "that most judicial precedents are tied to

particularized facts" and require us to "look at precedent *that is tied to the facts*").

If, as even Chief Alfred conceded, we were dealing with a situation in which he

refused to promote plaintiffs, who were otherwise qualified, to *preexisting*

positions based upon their race or gender, such a broad general statement would

have provided fair and clear warning; however, given the unique facts of this case

and the context in which this employment decision arose, the broad equal

protection principle articulated in our precedent was not enough to establish

"'with obvious clarity'" that the employment action taken by Chief Alfred was

unlawful. *Id.* at 1351. Accordingly, we must consider whether our precedent was

similar enough to put Chief Alfred on notice that his actions were unlawful. *See*

*id.*

---

[18]Although *Alexander* could not have put Chief Alfred on notice as it was decided in 2000, we look to it for guidance as it addressed whether the law pertaining to a variety of discriminatory actions taken by public officials was clearly established in 1992. *See* 207 F.3d at 1321 (relying upon our precedent to conclude that "there can be no doubt that in December 1992 . . . it was clearly established that intentional discrimination in the workplace on account of race violated federal law").

17

In *Yeldell*, we denied qualified immunity to an elected black official, Commissioner Reuben Davis, with respect to claims brought against him for discriminatory personnel decisions. 956 F.2d at 1065. The alleged discriminatory actions at issue were (1) a claim by a white female who was dismissed from her position as temporary nursing supervisor for maternal/infant care when Commissioner Davis hired a less qualified black woman to fill the position permanently even though recruitment previously had been frozen for monetary reasons; (2) a claim by a white man who held a position as an independent contractor for three years, but was dismissed when Commissioner Davis declined to renegotiate his contract and instead created a permanent position for which he was unqualified so that he could offer the position to a black man; and (3) claims by three other employees who alleged that Commissioner Davis was motivated by racial factors when he made discriminatory hiring and firing decisions. *Id.* at 1064–65. After determining that from 1986 through 1989 the law was clearly established that demoting and firing employees and passing candidates up for existing job opportunities because of their race constituted "intentional race discrimination in the workplace," we held that Commissioner Davis was not entitled to qualified immunity. *Id.*

In reaching our decision, we relied upon our binding precedent in *Brown*, in

18

which we denied qualified immunity to a city manager and police chief who were accused of firing a black police officer on the basis of his race. *See id.* at 1064 (citing *Brown*, 923 F.2d at 1478). Specifically, we reasoned that the alleged "intentional race discrimination in the workplace" in *Yeldell* "was [no] less frowned upon by the laws of this society" than in *Brown* where "we held that '[i]t is beyond doubt that the principal right allegedly violated by the defendants – the equal protection right to be free from intentional racial discrimination – was clearly established at the time [the police chief] and [the city manager] fired [the police officer].'" *Id.* (quoting *Brown*, 923 F.2d at 1478) (second through fourth alterations in original); *see also Smith v. Lomax*, 45 F.3d 402, 407 (11th Cir. 1995) (echoing our determination in *Yeldell* that in 1989 the law barring "intentional discrimination in the workplace" sufficiently put two black members of a board of county commissioners on notice that casting votes to replace a white female county clerk with a black female solely on account of race violated the Equal Protection Clause (internal quotation marks omitted)).

The plaintiffs argue that in addition to *Yeldell* two cases that were not decided in the qualified immunity context, *Batey v. Stone*, 24 F.3d 1330 (11th Cir.

1994), and *Dumas v. Town of Mount Vernon*, 612 F.2d 974 (5th Cir. 1980),[19] clearly established that Chief Alfred's decision was unlawful. In *Batey*, the plaintiff, a white female civilian employee of the United States Army, alleged that her supervisors discriminated against her on account of her gender by reorganizing the structure of the division in which she was employed to avoid promoting her and by denying her the opportunity to serve as acting director of the division. 24 F.3d at 1331, 1332 n.6. We held that under the Title VII analysis the district court's grant of summary judgment in favor of the appellee on both claims was improper because "genuine issue[s] of material facts exist[ed] concerning whether the appellee's employment decisions intentionally discriminated against [the plaintiff]." *Id.* at 1333, 1336.

Similarly, in *Dumas*, the plaintiff, a black female, alleged that the county refused to hire her for an existing vacancy due to her race and then later delayed filling the position when it became vacant even though she was the only certified candidate on the personnel board's employment register. *See* 612 F.2d at 976, 980. We reversed the district court's dismissal for failure to state a claim upon which relief could be granted and held that in alleging "that all defendants

---

[19]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

maintain racially discriminatory hiring practices, that each of the defendants decided and acted, separately and severally, not to fill the vacancy in order to avoid hiring a black person and that the Personnel Board and Town officials conspired to deprive [the plaintiff] of equal protection," the plaintiff sufficiently pled a race discrimination case under Title VII. *Id.* at 980.

In light of our precedent, we agree with the plaintiffs that it was clearly established in 1999 that it was unlawful for a public official to make a race- or gender-based decision concerning hiring, termination, promotion, or transfer to or from an existing position, *see, e.g.*, *Yeldell*, 956 F.2d at 1064–65; *Brown*, 923 F.2d at 1478, to refuse to fill an existing position because of the race of an applicant, *see Dumas*, 612 F.2d at 980, or to reorganize existing positions to avoid promoting an employee because of her gender, *see Batey*, 24 F.3d at 1333; *Yeldell*, 956 F.2d at 1064–65. Yet, the employment action at issue in this case is distinctly different than those employment actions. Indeed, Chief Alfred did not make a decision concerning an *existing* or viable position. Instead, the decision at issue was whether to *create* four permanent high-level positions in the fire department as proposed by a subordinate official – a decision that involves the core structure of the fire department. As we find this distinction significant, we conclude that the above case law did not put Chief Alfred on notice that it was unconstitutional to

make a decision not to *create* four new high-level positions as proposed by a subordinate official based solely upon the race or gender of the next eligible candidates.

Although we recognize that under *Hope* the exact unlawful action at issue need not have been resolved by previous case law, 536 U.S. at 739, we find it significant that the actions at issue in this case took place in a markedly different context than the other cases, *see Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003) (noting that in most qualified immunity cases preexisting case law that is factually similar is necessary to give officials "'fair notice' that the behavior violated a constitutional right"), *petition for cert. filed*, 71 U.S.L.W. 3737 (U.S. May 16, 2003) (No. 02-1694); *see Vinyard*, 311 F.3d at 1351–52 ("We believe that most judicial precedents are tied to particularized facts" such that factually similar case law is necessary to put public officials on notice of the unlawfulness of their actions.).  Specifically, all of the cases discussed above dealt with typical employment decisions that were made concerning an *existing* vacancy or a viable position.  The decision at issue here, however, was whether or not to *create* four new high-level positions.  Certainly, we cannot ignore the fact that there were no positions in existence when the decision was made and that the positions merely were proposed by a subordinate official who wanted Chief Alfred

22

to create the positions and expected him to do so before the eligibility list expired. Moreover, the plaintiffs were not entitled to a promotion *unless* a vacancy arose or a new position was created. Although intentional race- and gender-based discrimination is unlawful, none of the cases set forth by the plaintiffs fairly and clearly put Chief Alfred on notice that the decision at issue in this case was unlawful. As a result, we cannot say that Chief Alfred was "plainly incompetent" or that he "knowingly violat[ed] the federal law" when he decided not to create the new positions. *Vinyard*, 311 F.3d at 1346 (internal quotation marks omitted). Thus, we hold that Chief Alfred is entitled to qualified immunity in this case.

CONCLUSION

Although the plaintiffs' allegations establish that Chief Alfred violated the Equal Protection Clause, such a violation was not clearly established in 1999 when the unconstitutional act occurred. Under the unique facts of this case, we find that the general equal protection right to be free from employment discrimination did not provide Chief Alfred with fair and clear notice that his actions were unlawful. Furthermore, we were unable to find any case law that was similar enough to clearly establish that in 1999 it was a violation of the Equal Protection Clause for a public official to decline to *create* permanent positions as proposed by a subordinate official even when that decision was based upon the race or gender of

23

the next eligible candidates.  Thus, we hold that Chief Alfred is entitled to qualified immunity.  Accordingly, we REVERSE and REMAND this case to the district court with instructions to enter summary judgment in favor of Chief Alfred as to the claims brought against him in his individual capacity.