[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 27, 2004
THOMAS K. KAHN
CLERK

No. 02-14191

D. C. Docket No. 00-00469-CV-J-12

GEORGE A. WILLIAMS,
MICHAEL A. PERRYMAN, et al.,

Plaintiffs-Appellees,

versus

CONSOLIDATED CITY OF JACKSONVILLE,
RAYFIELD ALFRED,
Fire Chief, in his individual and
official capacities,

Defendants-Appellants.

————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————

**(August 27, 2004)**

ON PETITION FOR REHEARING EN BANC
(Opinion Aug. 14, 2003, 341 F.3d 1261 (11th Cir. 2003))

Before EDMONDSON, Chief Judge, TJOFLAT, ANDERSON, BIRCH,
DUBINA, BLACK CARNES, BARKETT, HULL, MARCUS, WILSON and
PRYOR, Circuit Judges.

BY THE COURT:

The Court having been polled at the request of one of the members of the Court and a majority of the circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedures; Eleventh Circuit Rule 35-5), the Petition for Rehearing En Banc is DENIED.

/s/ J. L. EDMONDSON
CHIEF JUDGE

WILSON, Circuit Judge, Concurring in the Denial of Rehearing En Banc:

I respectfully write a brief response to my colleagues who have dissented from the denial of rehearing en banc.

This was a qualified immunity case. The opinion[1] concludes that Rayfield Alfred, Fire Chief for the Consolidated City of Jacksonville, Florida, was entitled to qualified immunity when he postponed creating four new captain positions, based allegedly on the premise that the next available candidates on the eligibility list were white males. At the time, eight consecutive white males had previously been promoted. Alfred, an African-American, was newly appointed by Jacksonville's mayor from outside the department, in an effort to address the department's prior reputation for nepotism and racism. Although Alfred had discretion over whether to fill vacancies, he also had authority to create new positions within the Department. According to the testimony of a number of witnesses, Alfred delayed the creation of new positions in an effort to obtain a more diverse applicant pool, a pool that would also have included the plaintiffs. His decision resulted in plaintiffs' complaint pursuant to 42 U.S.C. § 1983 *inter alia*.

---

[1]*Williams v. Consol. City of Jacksonville*, 341 F.3d 1261 (11th Cir. 2003).

First, I agree with Judge Tjoflat that Fire Chief Alfred's conduct in *Williams* violated the constitutional rights of the plaintiffs. While the opinion recognizes that the action taken in this case was significantly different from the type of discriminatory conduct our Circuit has previously found unlawful, the opinion states unequivocally that a decision not to create new jobs, based solely on the race and gender of the next eligible applicants, in the absence of an affirmative action plan, violates the Equal Protection Clause. *See Williams v. Consol. City of Jacksonville*, 341 F.3d at 1269. If Alfred committed similar conduct today, he would be held responsible. Where I disagree with the dissenters, however, is whether clearly established law had placed Alfred on notice of this misconduct so as to strip him of his entitlement to qualified immunity.

No Eleventh Circuit or Supreme Court authority would have established to Chief Alfred that he could not hold up on creating new jobs until there was a more diverse applicant pool. We were unable to determine that the "contours of [the] right [were so clearly established] that a reasonable official would have understood his acts were unlawful." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Id*. Our Circuit has repeatedly stated that qualified immunity provides complete protection for

4

public officials from liability in their individual capacities except "all but the plainly incompetent or one who is knowingly violating federal law." *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001). "That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against the claims made against them in their *individual capacities*." *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc).

Our decision in *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056 (11th Cir. 1992), upon which the dissenters primarily hang their hats, is unavailing. *Yeldell* involved the actual hiring and firing for an **existing** job. Karan Cremer, a plaintiff in *Yeldell*, was removed from her job and replaced by a person of another race. *Yeldell* could not possibly have "clearly established" the impropriety of the conduct in the present case. Here, no job was ever created in the first instance. In fact, (1) no final decision had even been made as to whether the new positions would **ever** be created at all, and (2) if and when the positions were created, the new vacancies would be filled through a race-neutral hiring procedure, to which plaintiffs did not object, and in which they would have been permitted to compete.

Judge Tjoflat argues in dissent that the major point of difference between *Yeldell* and *Williams* – the fact that in *Yeldell*, Cremer was permitted to serve in

5

the position on a "temporary" basis, – is not sufficient "to remove Alfred's decision from the realm of *Yeldell*." Tjoflat dissent at 14. However, the simple truth is that in *Yeldell,* regardless of the hospital's nomenclature regarding the position, Cremer held the position of nursing supervisor at the time the unlawful employment decision was made. She was, as far as we know, engaged in every function of the eventual permanent position. This simply was not the case in *Williams*.

Here, all that can be said of Chief Alfred is that he decided not to create severally entirely new supervisory positions, a situation that is factually quite distinct from one in which an individual is terminated or removed from his or her position solely on the basis of race. The plaintiffs in *Williams* did not apply for existing captain's positions, and then see those jobs go to individuals of another race. Moreover, the plaintiffs were not serving in the positions before being terminated and replaced on account of race, as was the case in *Yeldell*. No position was ever created that could be filled by an individual of any race, let alone someone of a different race. No matter how much the facts of *Yeldell* are stretched, the case simply did not presage the situation presented here.

The dissenters' reliance upon *Smith v. Lomax*, 45 F.3d 402 (11th Cir. 1995) is equally unavailing. In *Lomax*, the Board of County Commissioners of Fulton

County, Georgia, voted to replace its white female clerk with an African-American female, at the conclusion of her six-year term. *See id.* at 403. Two African-American board members voted not to replace the clerk, allegedly on the basis of race. *See id.* The dissenters rely on *Lomax* as an expression of the general prohibition of racial discrimination in public employment. However, in spite of whatever general principles *Lomax* states, it narrowly and clearly frames its actual issue in terms of whether, at the time the commissioners cast their votes to terminate and replace the plaintiff, *that particular action* violated the plaintiff's constitutional rights. *See id.* at 407 ("[T]he question we must answer is whether at the time appellants exercised the discretionary function of casting their votes . . . their conduct violated a clearly established constitutional right of which a reasonable person would have known.") (quotation marks and citation omitted). Again, Lomax, like *Yeldell,* dealt with a race-based termination from and filling of an existing job, and it was filled by someone of another race. There is no dispute that the type of action prohibited in *Lomax* – racially-motivated **discharge** – had previously been established in our case law. *See Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th Cir. 1991).

In sum, no case existed in 1999 that clearly established the unconstitutionality of the conduct in *Williams*. Until *Williams*, we had not yet

dealt with a situation in which a decision-maker opted not to create entirely new jobs on the basis of race. In fact, as far as I am able to determine, no Circuit has to date. In addition, in *Williams*, the parties never even reached the point where an actual employment decision as to hiring or firing could have been made; the captain positions simply had not been created. Eleventh Circuit case law in no way previously had proscribed such conduct. Thus, while I agree fully with Judge Tjoflat that Alfred's conduct was unconstitutional, it certainly had not been clearly established as unconstitutional at the time in question. Consequently, en banc review was unnecessary.

8

TJOFLAT, Circuit Judge, Dissenting from the Denial of Rehearing En Banc:

This case involves a city official, Jacksonville Fire Chief Rayfield Alfred, who refused to create new positions within the Jacksonville Fire Department because he did not want them to be filled by people of a certain race. He comes before this court arguing that neither the Constitution nor the federal judiciary had given him sufficient warning that the Equal Protection Clause prohibits government officials from basing decisions of any sort, especially employment-related decisions, on racial considerations.[1] He argues that the law did not "clearly" prohibit him from discriminating against certain employees by denying them promotional opportunities based on their race.

For what may very well be the first time since Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954), a panel of this court agreed, holding that the defendant lacked reasonable notice that racial discrimination of this sort is unconstitutional. Because I believe that the defendant's behavior violated one of the Constitution's most fundamental tenets—thou shalt not base official governmental decisions on race—I respectfully dissent from this court's en banc refusal to hold Alfred accountable.

---

[1] The sole possible exception is the operation of a bona fide remedial affirmative action program. It is undisputed that no such program exists here.

9

Part I of this dissent offers a brief overview of both the facts and the panel's ruling. Part II explains how Chief Alfred's acts violated "clearly established law" in two different ways. First, his specific acts had already been held unconstitutional in <u>Yeldell v. Cooper Green Hosp., Inc.</u>, 956 F.2d 1056, 1065 (11th Cir. 1992). Second, his acts violated clearly established constitutional principles that prohibit government officials from taking race into account (outside the narrow context of certain bona fide affirmative action programs), both in general, and in the specific context of making decisions pertaining to government employment, <u>see</u> <u>Smith v. Lomax</u>, 45 F.3d 402 (11th Cir. 1995). Part III sets forth the factors that make this a question of exceptional importance and hence worthy of en banc consideration under Federal Rule of Appellate Procedure 35(a).[2] Part IV briefly concludes.

## I.

Promotion within the upper tiers of the Jacksonville Fire Department is based upon the results of a standardized test administered every two years. Every candidate for promotion must take this test and is ranked solely according to his or

---

[2] This rule provides in relevant part, "An en banc hearing or rehearing is not favored and ordinarily will not be ordered unless: (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance." Fed. R. App. P. 35(a).

her test score. Candidates must be promoted into available leadership slots according to the order in which they are ranked on this list. When a new test is administered, the results of the previous test automatically expire; to remain eligible for promotion, each applicant must take the new test.

In 1997, the Department administered one of these tests to determine eligibility for promotions; the results were to expire toward the end of October, 1999. Of the eight top scorers, seven were white males and one was a Hispanic male. All were promoted from lieutenant to captain. The next four highest scorers, who were next in line for promotion, were all white males.

In October, 1999, nine days before the results of the 1997 test expired, the chief of the Department's rescue division, Thomas McCrone, spoke with Chief Alfred about the possibility of creating four new "roving captain" positions. Chief Alfred declared that while "the concept of the positions and the justification for them were good," he "wanted to wait for a new [promotion] list, because he did not want to promote four white men to the new positions, as he had already promoted eight white men [including the Hispanic male] from the 1997 eligibility list." Alfred wanted to wait for the new list in the hope that his next promotions would better "reflect the diversity of the fire department." It is undisputed that this was an ad hoc decision of Alfred and was not part of a bona fide, formal

affirmative action program (and it is far from clear that under the circumstances of this case such a program would have been constitutional).

The next four highest scorers from the 1997 promotion list, who would have filled the roving captain positions had Alfred created them, sued Alfred under 42 U.S.C. §§ 1981 and 1983; Title VII, 42 U.S.C. §§ 2000e to 2000e-17; and the Florida Civil Rights Act, Fla. Stat. §§ 760.01-760.11. They claimed that "in the absence of a valid affirmative action plan[,] Chief Alfred's decision not to create the roving captain positions amounted to unlawful race and gender discrimination."

The plaintiffs brought suit against Chief Alfred in his individual and official capacities. Alfred moved to dismiss the suit against him in his individual capacity on qualified immunity grounds. The district court denied this motion, holding that the plaintiffs had adequately stated a cause of action. This court affirmed on interlocutory appeal. Williams v. Consol. City of Jacksonville, 268 F.3d 1067 (11th Cir. 2001) (unpublished table decision). We stressed, however, that "[f]urther proceedings will determine whether the Appellant is entitled to qualified immunity." Id.

After discovery, Alfred moved for summary judgment on qualified immunity grounds. Again, the district court rejected his motion. The panel,

however, reversed. <u>Williams v. Consol. City of Jacksonville</u>, 341 F.3d 1261 (11th Cir. 2003). It began by noting that Chief Alfred was acting within his discretionary authority in deciding whether to create the four new roving captain positions. Consequently, the burden shifted to the plaintiffs to demonstrate that Alfred was not entitled to qualified immunity. The panel explained that, to overcome this burden, the plaintiffs must demonstrate (1) that they alleged a violation of a constitutional right, and (2) that this right was clearly established at the time of the alleged violation. <u>See</u> <u>id.</u> at 1268-69. I enthusiastically endorse the panel's resolution of the first issue—that "a decision not to <u>create</u> new positions that is based solely upon the race and gender of the next eligible candidates for promotion, in the absence of a valid affirmative action plan, violates the Equal Protection Clause." <u>Id.</u> at 1369 (emphasis in original). It is the panel's second holding—that this right was not "clearly established" in 1999, at the time of Alfred's acts—with which I take serious issue.

II.

This circuit has held that a right can be "clearly established" in one of three ways. "First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified

13

immunity, even in the <u>total absence of case law</u>."  <u>Vinyard v. Wilson</u>, 311 F.3d

1340, 1350 (11th Cir. 2002) (emphasis in original).  The general language of the

Equal Protection Clause[3] is not, in itself, enough to "clearly establish" Chief

Alfred's acts as unconstitutional.

Second, "some broad statements of principle in case law" can be sufficient

to "clearly establish" conduct as unconstitutional.  <u>Id.</u> at 1351.  For example, we

have held that the general principle against warrantless searches and seizures

established in a variety of cases was enough to "clearly establish" that a probation

officer's warrantless entry into a doctor's office to look for a probationer was

unconstitutional.  <u>See</u> <u>O'Rourke v. Hayes</u>, No. 03-10795, 2004 U.S. App. LEXIS

15450, at *16 (11th Cir. July 27, 2004) ("Hayes did not have a search warrant, and

can point to no exigency justifying his search. Consequently, even if a factually

similar case did not exist, his actions would still have violated rights that are

clearly established under these general statements of principle.").  Similarly, we

have held that the doctrinal test for establishing whether an act is expressive

conduct protected by the First Amendment is sufficiently specific and easy to

apply that a high school senior's right to silently raise his fist in protest during a

---

[3] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

14

school's daily recitation of the Pledge of Allegiance was "clearly established." See Holloman v. Harland, 370 F.3d 1252, 1279 (11th Cir. 2004) ("Because this standard is 'clearly established,' is not at an unreasonabl[y] high level of generality, and when applied to the facts of Holloman's case yields a fairly determinate result that should have been clear, Allred and Harland are not entitled to summary judgment on qualified immunity grounds."). Section A of this Part discusses the clearly established Equal Protection principle against racial discrimination, both in general and in the specific context of decisions concerning public employment, that Alfred flouted.

The final way in which a constitutional right can be "clearly established" is if there is a case with indistinguishable material facts that established the government official's conduct as unconstitutional. See Vinyard, 311 F.3d at 1351 ("[I]f the circumstances facing a government official are not fairly distinguishable, that is, are materially similar," to the facts of a previous case, that "precedent can clearly establish the applicable law."). Section B of this Part analyzes how Alfred's conduct had squarely been held unconstitutional in Yeldell, 956 F.2d 1056.

A.

15

The first way in which Chief Alfred's acts had been "clearly established" as unconstitutional is through statements of generally applicable principle in binding precedents. Both the Supreme Court and this court have repeatedly declared that, with the possible exception of bona fide affirmative action programs, it is categorically improper for the government to base decisions or official action of any sort—particularly employment decisions—upon race or racial considerations. See, e.g., Washington v. Davis, 426 U.S. 229, 239, 96 S. Ct. 2040, 2047, 48 L. Ed. 2d 597 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."); Lomax, 45 F.3d at 407 ("We need not engage in a lengthy discussion of the patently obvious illegality of racial discrimination in public employment at the time the appellants voted to replace Smith."); Yeldell, 956 F.2d at 1064 (11th Cir. 1992) ("[I]ntentional race discrimination . . . [is] frowned upon by the laws of this society."); Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1478 (11th Cir. 1991) (recognizing that "the equal protection right to be free from intentional racial discrimination" is "clearly established").

As the Supreme Court declared in Miller v. Johnson, the Equal Protection Clause's "central mandate is racial neutrality in governmental decisionmaking." 515 U.S. 900, 904, 115 S. Ct. 2475, 2482, 132 L. Ed. 2d 762 (1995). This

16

principle applies with particular force to employment-related decisions.  See

Alexander v. Fulton County, 207 F.3d 1303, 1321 (11th Cir. 2000) ("[T]here can

be no doubt that . . . it was clearly established that intentional discrimination in the

workplace on account of race violated federal law.").  While there may be a

narrow exception to this rule for bona fide affirmative action programs, such an

exception would not permit government officials to engage in ad hoc race-based

decisionmaking at will.  See Bennett v. Arrington, 20 F.3d 1525, 1540 (11th Cir.

1994) ("It is, however, a necessity that some finding be made that the City

engaged in past discrimination, in order to allow for proper judicial review of the

City's use of race in its affirmative action plan.").

Notwithstanding these principles, the panel held that Alfred had not violated

a "clearly established" constitutional right of the plaintiffs.  In reaching this

conclusion, the panel focused on the fact that we had never before decided a case

in which an employer had refused to create a new position.  The panel explained

that prior Eleventh Circuit cases "dealt with typical employment decisions that

were made concerning an existing vacancy or a viable position.  The decision at

issue here, however, was whether or not to create four new high-level positions."

Williams, 341 F.3d at 1273-74 (emphasis in original).

17

I believe that the above-cited cases would have put any reasonable governmental official on notice that, absent a valid affirmative action plan, race is generally a suspect basis upon which to make _any_ sort of decision, especially a decision in the area of governmental employment. The panel erred in looking for a prior case in which the defendant took race into account in making the exact employment-related decision that Alfred made. Modern constitutional law's prohibition against racial discrimination is sufficiently broad and well-established that such specificity in precedent is unnecessary.

The panel erroneously construed the antidiscrimination law of this circuit as a discrete set of points: you may not discriminate in hiring decisions, see Batey v. Stone, 24 F.3d 1330, 1333 (11th Cir. 1994); you may not fire someone because of his or her race, see Brown, 923 F.2d at 1478; you may not fire someone for the purpose of replacing him or her with someone of a different race, see Lomax, 45 F.3d at 407; you may not decline to fill a vacancy on racial grounds, see Dumas v. Town of Mount Vernon, 612 F.2d 974, 980 (5th Cir. 1980)[4]; you may not discipline someone for an infraction unless people of all races are similarly disciplined when they commit the same infraction, see Alexander, 207 F.3d at

---

[4] This case also involved a statute-of-limitations issue that was the subject of a complex series of subsequent cases that do not affect the validity of the principle for which it is cited above.

18

1336; you may not fail to promote someone based on his race, see id. at 1339; and you may not tailor race-neutral requirements for a job so as to ensure that only people of a certain race will satisfy them, see Yeldell, 956 F.2d at 1065. The panel's view, that each of these cases establishes nothing more than a discrete and insular point of law, is erroneous.

Moreover, Eleventh Circuit precedents in which we denied government actors qualified immunity for engaging in race-based decisionmaking have relied upon the general antidiscrimination norms to which I refer. We have never forced a plaintiff to point us to a case in which a prior government official made the same exact racially discriminatory decision. For example, in Lomax, the plaintiff was a white county clerk who sued members of the Fulton County Board of Commissioners for voting to fire her so that it could hire a black clerk. Nowhere in that case's qualified immunity discussion did we cite any case in which members of a county board—or, indeed, any legislative body or government employer—voted to fire someone on racial grounds.

Instead, Lomax held:

We need not engage in a lengthy discussion of the patently obvious illegality of racial discrimination in public employment at the time the [defendants] voted to replace [the plaintiff]. As we stated in Yeldell, "it can hardly be argued that in . . . 1989, when the events leading up to this lawsuit [took] place . . . intentional race discrimination in the

19

workplace" did not violate the Fourteenth Amendment. . . . Given the clear state of the law prohibiting racial discrimination in public employment at the time the Board voted to replace [the plaintiff], no reasonable commissioner, with the information possessed by [the defendants], would have believed that his or her discriminatory actions were constitutional.

45 F.3d at 407 (emphasis added). Under a faithful application of Lomax, Alfred is not entitled to qualified immunity.

The law of this circuit—indeed, the law of this nation—is (and was in 1999) that, outside of certain narrow circumstances totally inapplicable to this case, a government official may not base decisions, particularly employment decisions, on racial grounds at all. This fact would have been readily apparent to a reasonable government actor considering the above-cited litany of cases and the statements of general principle they articulate.

## B.

The other way in which Alfred's acts were "clearly established" as unconstitutional is through our decision in Yeldell v. Cooper Green Hosp., 956 F.2d 1056, in which we allowed a suit against a government official who engaged in the same type of reverse-discrimination as Alfred. Plaintiff Karan Cremer, a white woman, was the temporary nursing supervisor for maternal/infant care for the defendant, Cooper Green Hospital. Another defendant, Jefferson County

Commissioner Reuben Davis, a black man, was in charge of the hospital's personnel decisions. Cremer claimed that Davis declined to create a permanent maternal/infant care supervisor position until he found a black woman, Elizabeth Bone, to apply for it. We stated,

> Ms. Cremer contends that Commissioner Davis permitted the creation of this position to go ahead only when a suitable black person could be found to take the job. Ms. Cremer further contends that her masters degree and greater experience made her better qualified for the position than Ms. Bone and that she was not selected solely because of her race.

Id. at 1065. We denied Davis qualified immunity against this claim, holding that "the laws allegedly violated by Commissioner Davis were clearly established." Id. at 1064.

Yeldell is materially indistinguishable from the instant case. Both the plaintiff in Yeldell and the plaintiffs here are Caucasian. Both the defendant in Yeldell and the defendant here are African-American. Both defendants decided to delay the creation of new positions—a new permanent nursing supervisor position in Yeldell, and new roving captain positions in the instant case—because the person most likely to fill each position was Caucasian. Both defendants decided to hold off on creating or filling those new positions until a later time when there

21

was a greater chance of recruiting a minority. Neither defendant acted pursuant to a bona fide affirmative action program.

The only arguable variation between Yeldell and the instant case is that Cremer was permitted to act as a "temporary" nursing supervisor until a permanent position was created, while the white men who would have filled the permanent roving captain positions were not temporarily acting in that capacity at the time of Alfred's decision, though they were later designated acting captains "on a provisional basis." I do not believe this one fact is enough to remove Alfred's decision from the realm of Yeldell. If our law "clearly" prohibited such discriminatory behavior in 1992 when Yeldell was decided, it necessarily continued to do so in 1999.

### III.

For this court to review en banc a panel ruling, the ruling must not only be erroneous, but also involve a "question of exceptional importance." Fed. R. App. P. 35(a)(2). The panel's ruling meets this standard because it implicates two critically important areas: qualified immunity and race. I will explore each separately.

### A.

Section 1983 is virtually the only way in which victims of constitutional violations by state and local officials can vindicate their fundamental rights. Requiring that rights be "clearly established" with an unreasonably high degree of specificity leaves individuals vulnerable to constitutional travesties while allowing government officials to evade responsibility.

In Hope v. Pelzer, the Supreme Court declared that we had placed a "rigid gloss on the qualified immunity standard" that was "not consistent with [its] cases." 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002). Our post-Hope decisions demonstrate that we have not yet achieved a consensus on what the elusive phrase "clearly established" means. In particular, we do not have a unified standard on how to interpret our holding in Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002), that "some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." This case is the perfect vehicle for explaining the reach of this crucial holding in Vinyard. Consequently, if reheard en banc, this case would have had enormous precedential value and could dramatically clarify the law to the benefit of future parties and panels.

In this particular case, the exact qualified immunity standard we apply is not important. Alfred's behavior was so patently unconstitutional, so clearly

23

prohibited by precedent, that he could not expect immunity under any reasonable standard. However we choose to interpret the phrase "clearly established law," even a brief consideration of Alfred's acts reveal them to be beyond the bounds of constitutional propriety. The hair that the panel sought to split—that no previous case had involved an employer declining to create a new position on racial grounds[5]—is unpersuasive. The panel's approach requires a degree of specificity in precedent that none of our prior opinions demands and that effectively eviscerates our circuit's repeated condemnation of all racial discrimination and race-based decisionmaking in public employment.[6]

Qualified immunity is meant to ensure that government officials are not afraid to fulfill their job-related responsibilities. See Richardson v. McKnight, 521 U.S. 399, 408, 117 S. Ct. 2100, 2105, 138 L. Ed. 2d 540 (1997) (noting that the purpose of qualified immunity is to "protect[] the public from unwarranted timidity on the part of public officials"); Butz v. Economou, 438 U.S. 478, 506, 98 S. Ct. 2894, 2911, 57 L. Ed. 2d 895 (1978) (noting that the purpose of qualified immunity is to "encourag[e] the vigorous exercise of official authority"). However, due regard for constitutional rights means that officials should tread

---

[5] A position the panel cannot tenably maintain in light of Yeldell, see supra Section II.B.

[6] Again, with the possible exception of bona fide remedial affirmative action programs.

lightly in matters fraught with constitutional underpinnings. We would not enjoy much true freedom if, whenever a government official had doubts as to the existence or scope of a constitutional right, he were always permitted to resolve them against that right. The "clearly established" prong of the qualified immunity test should not be interpreted or applied so as to encourage every public official to consistently resolve every question or hesitation against individual rights and liberty.

Furthermore, if the "clearly established" prong of the qualified immunity test is interpreted unduly strictly, it will effectively prevent further development of wide areas of constitutional law. An attorney deciding whether to represent the victim of a constitutional violation will be extremely reluctant to bring a case when there is no precedent squarely on point. If an unreasonably high "clearly established" hurdle precludes many cases involving arguable constitutional violations from being brought, then the stream of precedents recognizing certain governmental acts as constitutional violations will dry up. This, in turn, will further reduce the number of "clearly established" constitutional violations, which will further reduce the number of § 1983 cases brought, and the cycle will continue. The Supreme Court recognized this concern in County of Sacramento v. Lewis, in which it held that courts performing a qualified immunity analysis must

25

always begin by addressing the threshold question of whether a constitutional right has been violated, instead of simply assuming <u>arguendo</u> that a right was violated and then granting the defendant qualified immunity because the right was not clearly established at the time. 523 U.S. 833, 841 n.5, 118 S. Ct. 1708, 1714 n.5, 140 L. Ed. 2d 1043 (1998) ("[I]f the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals."). For these reasons, the proper scope of qualified immunity is a sufficiently important question as to warrant en banc reconsideration of this case.

## B.

Racial controversies have plagued our country, and the South in particular, since the Founding Era; the objective importance of adjudicating a potential racial injustice cannot be gainsaid. Careful consideration of racial discrimination charges are always of "exceptional importance," not only to the parties involved, but to society at large. Thus, this case is extremely important not only because of the opportunity it presents to clarify qualified immunity jurisprudence, but precisely because it arises in a sensitive and fundamental area such as race.

## IV.

26

Racial discrimination by government officials—regardless of the race of the victims—is blatantly unconstitutional. This principle is clear, and applies regardless of whether there is a Supreme Court or Eleventh Circuit case on point involving racial discrimination in <u>precisely</u> the same context. No government official could have reasonably believed in 1999 that ad hoc, race-based decisionmaking was constitutional. Moreover, Alfred's acts had already been squarely prohibited by <u>Yeldell</u>. For these reasons, the panel's decision is fundamentally flawed. Because it implicates both qualified immunity and race relations, the opinion warrants rehearing en banc. I dissent.

BARKETT, Circuit Judge, Dissenting from the Denial of Rehearing En Banc:

I agree with Judge Tjoflat that en banc review is warranted in this case. Under the panel's own analysis, its qualified immunity holding cannot be reconciled with the Supreme Court's decision in Hope v. Pelzer, 536 U.S. 730 (2002). In Hope, the Court found that our circuit's "rigid gloss on the qualified immunity standard," which required that the facts of previous cases be "materially similar" to those of the case under review, was "not consistent with [the Supreme Court's] cases." 536 U.S. at 739. Intentional governmental discrimination solely on the basis of race has been held to violate the Equal Protection Clause since long before the events that gave rise to this case. The panel found as much in holding in the first instance that

> a decision not to *create* new positions that is based solely upon the race and gender of the next eligible candidates for promotion, in the absence of a valid affirmative action plan, violates the Equal Protection Clause.

Williams v. Consolidate City of Jacksonville, 341 F.3d 1261 (11th Cir. 2003), 1269 (emphasis in the original). Once committed to the proposition that Chief Alfred's action, although "significantly different than the types of discriminatory employment actions we formerly found unlawful," was "essentially an intentionally discriminatory race-and-gender-based employment decision," id.

28

(emphasis added), Hope requires that we consider his action to be a violation of clearly established law.

Moreover, if the panel's first holding is correct – that is, that a decision not to create a position for racial reasons violates equal protection – then that law seems to have been clearly established in Yeldell v. Cooper Green Hospital, 956 F.2d 1056 (1992). In Yeldell, we found that an employer's alleged decision not to create a position for which a temporarily employed white candidate would have been eligible until a black candidate could be found for the job would violate clearly established law. Id. at 1064-65. As both the panel and Judge Tjoflat suggest, a decision not to create a position solely on the basis of race or gender would not fall afoul of the Fourteenth Amendment if undertaken pursuant to a valid affirmative action plan. Assuming that this exception is not at issue, Yeldell would seem to control here.

Whether the facts of Yeldell or, indeed, of this case, should be reconsidered to determine whether they implicate a valid affirmative action plan is another matter, and would itself have been worthy of en banc review.