[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12348

_____

D.C. Docket No. 5:14-cv-00143-RS-GRJ

HAROLD FISH,

Plaintiff - Appellant,

versus

TIM BROWN, *et al.*,

Defendants – Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(October 3, 2016)

Before ED CARNES, Chief Judge, and JORDAN, Circuit Judge, and SMITH,[*]
District Judge.

_____

[*] Honorable C. Lynwood Smith, Jr., United States District Judge for the Northern District
of Alabama, sitting by designation.

SMITH, District Judge:

Two Holmes County, Florida, Deputy Sheriffs entered the home of appellant while accompanying his former lover to the residence for the purpose of retrieving personal belongings left there. The Deputies observed guns in the home and arrested appellant for violating an injunction prohibiting his possession of firearms. He filed suit in the state court system, claiming that the Deputies did not have permission to enter his home, or to proceed so far into the interior that they could see guns. He also alleged they lacked probable cause to arrest. The case was removed to the United States District Court based upon federal question jurisdiction over appellant's Fourth Amendment claims,[1] and supplemental jurisdiction over his state-law claims.[2] On motion for summary judgment, the district court found that the Deputies were entitled to qualified immunity and dismissed the federal claims with prejudice. Appellant's supplemental state-law claims were remanded. This appeal followed. After consideration of the parties' briefs and with the benefit of oral arguments, we affirm.

## I. STANDARD OF REVIEW

---

[1] *See* 42 U.S.C. § 1983, and 28 U.S.C. § 1331.

[2] *See* 28 U.S.C. § 1367.

2

We review a "district court's order granting summary judgment de novo, 'viewing all the evidence, and drawing all reasonable inferences' in favor of Plaintiff." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) (quoting *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 767 (11th Cir. 2005)). "Summary judgment is only proper if there are no genuine issues of material fact, and Defendant is entitled to judgment as a matter of law." *Id.* (citing *Vessels*, 408 F.3d at 767).

## II. FACTS

*Heav'n has no Rage like Love to Hatred turn'd*
*Nor Hell a Fury like a Woman Scorn'd*

William Congreve, *The Mourning Bride*
Act III, Scene viii (1697).

Harold Anthony Fish, generally known as "Tony," is an unmarried man. There is no evidence that he ever read William Congreve's play, but the events leading to this appeal demonstrate that he learned the painful truth of Congreve's observation from his former lover, Margo Denise Riesco. Fish began a sexual relationship with Riesco on some undisclosed date in 2008.[3] Throughout their

---

[3] *See* N.D. Fla. doc. no. 49-13 (Riesco Deposition), at ECF 5 ("**Q**. Describe for me the nature of that relationship. **A**. Sexual."); *id.* at ECF 6 (testifying that the affair with Fish lasted "[f]rom 2008 until 2011") (alteration supplied). *But see* Appellant's Brief, at 3 (stating that the relationship began "[a]round 2009") (alteration supplied).

3

affair, Riesco resided in Alabama with her husband,[4] but she periodically traveled to Fish's home in a rural area near Bonifay, Florida,[5] where she stayed with him for as long as a week at a time.[6]  Fish asked Riesco to leave her husband in late 2010, but she declined to do so.  Fish reacted by calling Riesco's husband and disclosing their affair.  That not only ended the relationship,[7] but unsurprisingly caused Riesco to develop "animosity or ill feelings toward Mr. Fish."[8]

On March 11, 2011, following the end of the affair, a Florida Circuit Court entered an injunction in favor of Fish's sister and brother-in-law, protecting them

---

Note:  "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing"). Bluebook Rule 7.1.4 allows citation to page numbers generated by the ECF header. *The Bluebook: A Uniform System of Citation*, at 21 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010).  Even so, the Bluebook recommends against citation to ECF pagination in lieu of original pagination.  Consequently, unless stated otherwise, this court will cite to the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters "ECF."

[4] N.D. Fla. doc. no. 41-4 (Riesco Deposition), at ECF 7.

[5] *Compare* N.D. Fla. doc. no. 48 (Fish's Statement of Facts), ¶ 13 (Riesco's "visits were anywhere from six to eight weeks apart") *with* N.D. Fla. doc. no. 49-13 (Riesco Deposition), at ECF 5 ("**Q**.  How often would you-all see each other?  **A**.  Once every couple of weeks.").

[6] N.D. Fla. doc. no. 48 (Fish's Statement of Facts), ¶ 13 ("Ms. Riesco never stayed longer than one week at a time.").

[7] *Id.*, ¶ 14 ("In or around late 2010, Plaintiff ended the relationship with Ms. Riesco."). *But see* N.D. Fla. doc. no. 49-13 (Riesco Deposition), at ECF 6 (testifying that her relationship with Fish lasted "until 2011").

[8] N.D. Fla. doc. no. 49-13 (Riesco Deposition), at ECF 6.

from acts of domestic violence by Fish.  Among other things, he was prohibited from having any firearm in his "care, custody, possession or control."[9]  Riesco learned of the injunction from Fish's sister, with whom she had maintained a friendship.[10]

Riesco called Fish on April 20, 2011, and announced that she was en route to his home for the purpose of retrieving personal items left there.[11]  Before driving all the way to his residence, however, she stopped by the office of the Holmes County, Florida, Sheriff to request an escort.[12]  The exact words spoken by Riesco

---

[9] *See* N.D. Fla. doc. no. 41-2, at ECF 5 (*James & Tabitha Wichowski vs. Harold Anthony Fish*, No. 11-69DR, slip op. at ¶ 3 (14th Judicial Circuit, Holmes Co., Fla. Mar. 11, 2011)).  The full text of the pertinent provision reads as follows:

> **3. Firearms.  Unless paragraph a. is initialed below** [*and it was not*], **Respondent shall not have in his or her care, custody, possession or control any firearm or ammunition.  It is a violation of section 790.233, Florida Statutes, and a first degree misdemeanor, for the respondent to have in his or her care, custody, possession or control any firearm or ammunition.** [Boldface in original, alteration supplied.]

[10] *See* N.D. Fla. doc. no. 41-4 (Riesco Deposition), at ECF 18; *see also* N.D. Fla. doc. no. 41-1 (Fish Deposition), at ECF 24 (testifying that Riesco learned of the injunction "[e]ither through my sister or through me or whatever") (alteration supplied).

[11] N.D. Fla. doc. no. 41-1 (Fish Deposition), at ECF 23 ("She called and told me she was coming to pick up her stuff."); *id.* at ECF 25 ("I left work, left my son at the shop, went home.").

[12] N.D. Fla. doc. no. 54 (District Court Order Granting Summary Judgment), at 3 (citing N.D. Fla. doc. no. 40 (Defendants' Statement of Facts), at 4 ("Margo Riesco also, on that date, contacted the Holmes County Sheriff's Office in order to request assistance while she recovered her property from the home of Plaintiff.  Ms. Riesco told representatives at the Sheriff's Office that she was concerned about the manner in which Plaintiff might react to her presence and that she knew Plaintiff to be in possession of firearms.")).

5

are disputed, but it is clear that "she at least told the officers that she feared for her safety during the encounter . . . ."[13]

Deputy Tyler Harrison was instructed by a Departmental supervisor to escort Riesco, and Deputy Tom Loucks was separately directed to meet Riesco and Harrison at the residence, to provide "back up."[14]  Harrison followed Ms. Riesco's vehicle in his official cruiser.  As they neared Fish's residence, Harrison activated a video camera mounted on the dash of his vehicle, and Riesco's maroon automobile can be clearly seen traveling on unpaved roads in a rural, heavily-

---

[13] N.D. Fla. doc. no. 54 (District Court Order Granting Summary Judgment), at 4 (citing N.D. Fla. doc. no. 40 (Defendants' Statement of Facts), at 4; and N.D. Fla. doc. no. 48 (Plaintiff's Statement of Facts), at 9-10).  *See also* N.D. Fla. doc. no. 41-4 (Riesco Deposition), at ECF 9 (testifying that Fish had "hit me before and gotten violent and I didn't want that to happen again").

The omitted portion of the sentence from the District Court's opinion quoted in text stated that Ms. Riesco "told the officers . . . that Fish had guns in his home."  Fish denied that assertion.  *See* N.D. Fla. doc. no. 48 (Plaintiff's Statement of Facts), ¶ 2, at 2; *id.* ¶ 18, at 9-10. His denial was based upon Ms. Riesco's testimony that she could not "recall" telling the Deputies that Fish had firearms in his home.  *Compare* N.D. Fla. doc. no. 41-4 (Riesco Deposition), at ECF 9-10 *with* N.D. Fla. doc. no. 41-3 (Affidavit of Tyler Harrison) ¶ 3 ("Ms. Riesco told representatives at the Sheriff's office that she was concerned about the manner in which Plaintiff might react to her presence *and that she knew plaintiff to be in the possession of firearms*.") (emphasis supplied).

[14] N.D. Fla. doc. no. 41-3 (Affidavit of Tyler Harrison), ¶¶ 3-4.

wooded area.[15]  She drove her automobile to the rear of the house and parked next to Fish's SUV.[16]

Riesco exited her vehicle first, and confidently strode to the glass door opening into a sunroom located on the back side of the house, adjacent to a patio and swimming pool area.[17]  Deputies Harrison and Loucks followed.

Riesco opened the unlocked glass door and walked, without hesitation, into the sunroom.  At the moment Deputy Harrison reached the threshold of the sunroom door, Riesco can be heard — by means of a microphone attached to Harrison's uniform and linked electronically to the video camera on the dash of his cruiser — knocking on an interior wooden door that previously, prior to construction of the sunroom, had been the rear entrance to the residence.[18]  She

---

[15] *See* N.D. Fla. doc. no. 49-8 (Plaintiff's Ex. 8:  DVD Disc containing video and audio recorded on Apr. 20, 2011 by the dash camera on Deputy Harrison's cruiser), at time counter numbers 00:00 to 01:00 (hereafter "**DVD**").

[16] *Id.* at 01:00 to 01:31.

[17] *Id.* at 01:32 to 02:02

[18] *Id.* at 02:03 to 02:05.  On some undisclosed date after Fish ended the affair, he converted a portion of the back patio of his home into a sunroom.  The room was temperature-controlled and had tile floors, full exterior walls with cedar paneling on the interior, and windows with blinds that usually remained closed.  The room was furnished with a television, radio, desk, chairs, table, and lamp.  The glass door that opened into the sunroom was furnished with a lock, but on the date of the events discussed in text the door was not bolted.

7

then said loudly, "Tony?"; and when he responded "Yeah," she announced "I'm here."[19]

When Fish opened the wood door, he saw Deputies Harrison and Loucks standing directly behind Riesco.[20]  Harrison was in uniform, but Loucks was dressed in street clothes.  Even so, Loucks's badge and sidearm were visible.[21] Nevertheless, neither Deputy withdrew his weapon from its holster, and neither placed his hand on his pistol's handle in a manner indicating that he intended to draw it.[22] Harrison spoke first, saying:

> HARRISON:  Hey, Tony.
>
> FISH:  How you doing?
>
> HARRISON:  You doing all right?
>
> FISH:  Uh-huh.

DVD at 02:11 to 02:13.  Ms. Riesco then stated:

> RIESCO:    I brought them to watch so I don't steal nothing of yours, okay?

---

[19] *Id.* at 02:05 to 02:10.

[20] N.D. Fla. doc. no. 41-1 (Fish Deposition), at ECF 25.

[21] *Id.* at ECF 35; N.D. Fla. doc. no. 48 (Fish's Statement of Facts), ¶ 23 (stating that Fish "was surprised to see Defendant Harrrison, in full uniform, directly behind Ms. Riesco and then Defendant Loucks immediately behind him, in plain clothes with a badge and a firearm visible").

[22] N.D. Fla. doc. no. 41-1 (Fish Deposition), at ECF 35-36; N.D. Fla. doc. no. 41-3 (Affidavit of Tyler Harrison), ¶ 6.

8

FISH:  All right.

RIESCO:  All Right.

LOUCKS:  Doing all right, man?

FISH:  I'm good.

DVD at 02:14 to 02:21.

It is obvious that Riesco, Harrison, and Loucks then walked into Fish's home because, a few seconds after the foregoing exchange, Deputy Harrison can be heard asking Fish what personal items had been left in the house by Riesco — "What all she got here?" — and Fish responded:  "It's all in that drawer in there,"[23] indicating the bedroom that adjoined the living room and kitchen area in which the parties then were standing.  As Riesco searched the bedroom, she asked:

RIESCO:  Where's my helmet and my boots?

FISH:  In that drawer.

RIESCO:  What about my toiletries?

FISH:  It's in there in the bathroom.

RIESCO:  My boots aren't in here.

FISH:  They're on the floor.

---

[23] DVD at 02:28 to 02:31.

9

DVD at 02:33 to 02:54.

At that juncture, Deputy Harrison observed through the bedroom door a large revolver hanging in its holster from one of the bedposts.[24] He asked: "Tony, you still got that injunction against you for the firearms? . . . Says you can't have firearms in your possession."[25] Deputy Harrison filed an affidavit in support of summary judgment stating:

> I had previously been advised by my supervisor at the Sheriff's Office that there was in place an injunction against domestic violence pertaining to the Plaintiff. I had also been told by Ms. Riesco that the Plaintiff was in possession of firearms. Although I did not have the domestic violence injunction in hand, I was familiar with injunctions of this nature and I am familiar with the form utilized by the court in Holmes County which generally contained a prohibition against the possession or control of firearms or ammunition.

N.D. Fla. doc. no. 41-3 (Affidavit of Tyler Harrison), ¶ 8.[26]

---

[24] *See* N.D. Fla. doc. no. 41-3 (Affidavit of Tyler Harrison), ¶ 7 ("Upon entering the home, from the vantage point of the living room, I was able to observe a revolver style firearm in a holster hanging from a bedpost. I was also able to observe portions of a number of other long guns under a bed in the bedroom."). Fish acknowledged during his deposition that anyone who walked into his bedroom would have seen the revolver hanging from his bedpost. N.D. Fla. doc. no. 41-1 (Fish Deposition), at ECF 39 ("Anybody that walked into the bedroom could have saw it [*sic*].").

[25] DVD at 03:03 to 03:08 (ellipsis supplied).

[26] *See supra* note 10  for the text of the standard language of the pre-printed, form injunction utilized in Holmes County, and stating that it was a violation of Florida law for the subjects of such injunctions to possess a firearm or ammunition.

10

Deputy Harrison testified that he was "able to observe portions of a number of other long guns under a bed in the bedroom."[27]  Fish denied that the guns were in plain view, readily visible to Harrison,[28] but his denial was proven false by his own recorded statements, which clearly establish through use of the plural pronouns "they," "those," and "them" that he and Deputy Harrison disputed the ownership of more than just the one revolver that was hanging from a bedpost in plain sight:

> HARRISON:  Tony, you still got that injunction against you for the *firearms*?
>
> FISH:  Huh-uh.
>
> HARRISON:  Says you can't have *firearms* in your possession?
>
> FISH:  *Those* aren't mine.
>
> HARRISON:  Whose are *they*?
>
> FISH:  Jared's [*i.e.*, Fish's son].
>
> HARRISON:  Well, *they're* out in the open.
>
> FISH:  *They're* Jared's.

---

[27] N.D. Fla. doc. no. 41-3 (Affidavit of Tyler Harrison), ¶ 8; N.D. Fla. doc. no. 41-1 (Fish Deposition), at ECF 39 ("**Q**:  Okay.  Where were the other weapons?  **A**:  Under the bed.  **Q**:  All of the other weapons were under the bed?  **A**. Uh-huh.").

[28] *See, e.g.*, Appellant's Brief, at 8 ("No other firearms were visible.  . . .  [A]ny firearms that were under the bed were not visible.") (ellipsis and alteration supplied).

11

HARRISON:  Whose room is this?

FISH:  Huh?

HARRISON:  Whose room is this?

FISH:  Well, I stay here sometimes, and Jared stays here sometimes.

HARRISON:  *They're* not locked up, though, is what I'm telling you.

FISH:  Oh, okay.  I'll tell him to lock *them* up.

HARRISON:  Naw.  He's going to have to see the judge about that.

FISH:  Who?

HARRISON:  Jared.  We're going to take *them* with us. And you're going to —

FISH:  You're not taking *those guns*.

HARRISON:  Yes, sir, I am.

FISH:  No, you're not.

HARRISON:  Yes, sir.

FISH:  No, you're not.

HARRISON:  (Inaudible.)

FISH:  You're not.

HARRISON:  (Inaudible.)

12

FISH:  You haven't got a warrant.  You're in my house.

HARRISON:  *They're* in plain sight, Tony.  I don't need one. It's in plain view.  Turn around.

FISH:  No. No.

HARRISON:  Tony, you're under arrest.  You can make it hard on yourself or easy.

FISH:  Let me call Jared.

HARRISON:  No, sir.

FISH:  Let me call Jared.

HARRISON:  (Inaudible.)

DVD at 03:03 to 04:04 (emphasis supplied).  In any event, Fish did not deny that an urn full of ammunition was clearly visible in the bedroom.[29]

After Harrison placed Fish under arrest, implicitly for violation of the state statute recited in the domestic violence injunction,[30] Fish leaned against the kitchen

---

[29] N.D. Fla. doc. no. 41-1 (Fish Deposition), at ECF 66.

[30] *See supra* note 10 ("**It is a violation of section 790.233, Florida Statutes, and a first degree misdemeanor, for the respondent to have in his or her care, custody, possession or control any firearm or ammunition**.") (boldface in original).

13

sink with his hands behind his back in a vain attempt to prevent being placed in handcuffs, and Harrison added the charge of resisting an officer without violence.[31]

Several minutes later, Riesco can be heard on the video whispering a statement to Officer Harrison that suggested her satisfaction over having manipulated a situation that resulted in trouble for the man who had spurned her affections:  "Did that work out like a charm, or what?"[32]

The criminal charges against Fish ultimately were dismissed, and he filed a complaint in a Florida Circuit Court, asserting claims against Holmes County Sheriff Tim Brown in his official capacity, and Deputies Harrison and Loucks in their individual capacities.[33]  Specifically, Fish asserted claims of:  (1) state law false arrest and imprisonment against defendants Harrison and Loucks (Count I); (2) state law false arrest and imprisonment against the Holmes County Sheriff's Office (Count II); (3) state law malicious prosecution against defendants Harrison and Loucks (Count III); (4) Fourth Amendment illegal search and seizure claims

---

[31] N.D. Fla. doc. no. 41-1 (Fish Deposition), at ECF 55 ("And I backed up to the kitchen sink and I told him that he wasn't taking the guns.  And they turned — they turned me around and put the handcuffs on me, and I guess I was on my way to jail."); N.D. Fla. doc. no. 41-3 (Affidavit of Tyler Harrison), ¶ 10.

[32] DVD at 8:10-12.

[33] N.D. Fla. doc. no. 1-1 (Complaint), at ECF 2.

14

against defendants Harrison and Loucks (Count IV); and (5) Fourth Amendment false arrest against the Holmes County Sheriff's Office (Count V).[34]  Defendants removed the case to the United States District Court for the Northern District of Florida, where Fish voluntarily dismissed his claims against the Holmes County Sheriff, leaving only his claims against Deputies Harrison and Loucks.[35]  The district court entered an order granting summary judgment in favor of both defendants on Fish's federal constitutional claims, and remanded his supplemental state-law claims.[36]  This appeal followed.

## III. DISCUSSION

The district court held that Deputies Harrison and Loucks were entitled to qualified immunity from Fish's Fourth Amendment claims.  The doctrine of qualified immunity protects governmental officials who are sued under 42 U.S.C. § 1983 for money damages in their personal, or individual, capacities, but only so long as "their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The doctrine requires that a defendant claiming

---

[34] *Id.* at ECF 2-14.

[35] N.D. Fla. doc. no. 8.  *See also* Appellant's Brief, at 2; Appellees' Brief, at 4.

[36] *See* N.D. Fla. doc. nos. 54 (District Court Opinion) and 55 (Judgment).

immunity must initially "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). If that threshold prerequisite is satisfied, courts generally apply a two-part test. The initial inquiry requires the court to determine whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201 (2001). If that question is answered affirmatively, the court will proceed to analyze the second aspect of the two-part inquiry: *i.e.*, "whether the right was clearly established." *Id.* Strict adherence to the order of those two inquiries is not required, however. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."). Instead, in appropriate cases, it is within a district court's discretion to assume that a constitutional violation occurred in order to address, in the first instance, the question of whether such a presumed violation was "clearly established" on the date of the incident leading to suit. *Id.*

When determining whether the unlawfulness of an official's actions was "clearly established," the pertinent question is whether the state of the law on the

16

date of the defendant's alleged misconduct placed defendants on "fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer,* 536 U.S. 730, 741 (2002) (alteration supplied); *Williams v. Consolidated City of Jacksonville,* 341 F.3d 1261, 1270 (11th Cir. 2003) (same).

The Supreme Court has rejected the requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff. *Hope*, 536 U.S. at 739. Instead, in order for a constitutional right to be deemed "clearly established,"

> its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [*v. Forsyth,* 472 U.S. 511,] 535, n. 12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope*, 536 U.S. at 741 (alteration in original). An officer can receive "fair notice" of his or her unlawful conduct in various ways.

> First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law.* This kind of case is one kind of "obvious clarity" case. For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.

17

Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law.* When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. *See Marsh* [*v. Butler County, Ala.*]*,* 268 F.3d [1014,] 1031-32 n.9 [11th Cir. 2001]. For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation. These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances. These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions. But for judge-made law, there is a presumption against wide principles of law. And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts.* That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances." We believe that most judicial precedents are tied to particularized facts and fall into this category. . . . When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies. On the other hand, if the circumstances facing a government

18

official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

*Vinyard v. Wilson,* 311 F.3d 1340, 1350-52 (11th Cir. 2002) (emphasis in original, alterations supplied). *See also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

Although Fish's claims for the defendants' alleged Fourth Amendment violations comprised only one count of his complaint (*i.e.*, Count IV), it is clear that he asserted separate claims for an *unlawful entry into and search of his home*, and, for *unlawful arrest*.

## A.    Unlawful Entry

Fish first asserts that Deputies Harrison and Loucks violated his Fourth Amendment rights by entering his home without either a warrant or consent.

> The Fourth Amendment guarantees people the right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Without a warrant, "a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. —, —, 134 S. Ct. 2473, 2482, 189 L. Ed. 2d 430 (2014). One exception is that a warrantless search is lawful when a person with actual or apparent authority voluntarily consents to law enforcement officers conducting a search. *United States v. Watkins*, 760 F.3d 1271, 1279 (11th Cir. 2014); *Bates v. Harvey*, 518 F.3d 1233, 1243 (11th Cir. 2008).

19

*United States v. Thomas*, 818 F.3d 1230, 1239-40 (11th Cir. 2016).[37]

### 1.    Entry into the sunroom

The district court correctly found that Deputies Harrison and Loucks were entitled, under the facts of this case, to qualified immunity on Fish's claim for unlawful entry into his sunroom. We will assume, like the district court, that "the sunroom was not a place where the public would be expected to go"[38] and, therefore, was entitled to the same level of Fourth Amendment protection as the home itself. *See United States v. Noriega*, 676 F.3d 1252, 1262 (11th Cir. 2012) ("A home's curtilage, '[t]he private property immediately adjacent to a home[,] is entitled to the same protection against unreasonable search and seizure as the home itself.'") (quoting *United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir. 2006)) (alterations in original).

Even so, like the district court, we need not determine whether defendants violated Fish's Fourth Amendment rights by stepping into his sunroom without his explicit consent, because we find that they are entitled to qualified immunity on

---

[37] No other exceptions to the warrant requirement, such as exigent circumstances, have been asserted here.

[38] N.D. Fla. doc. no. 54 (District Court Opinion), at 11.

any such claim.[39] Defendants followed Riesco, whom they knew was familiar with Fish's home. She parked her automobile in the rear of the house, next to Fish's SUV. No vehicles were parked in front of the house. Riesco walked confidently from her auto to and through the sunroom door without knocking, or checking to see if it was locked (as though she expected it to be unlocked). She proceeded to walk straight through the sunroom to the interior wood door and knocked. Reisco's authoritative demeanor caused Deputies Harrison and Loucks to conclude that was the customary route taken by guests entering the house, and they followed her lead.[40]

Those facts lead to a finding of qualified immunity for two reasons. First, the Deputies could reasonably have relied upon a variation of the "consent-once-removed" doctrine, "which permits a warrantless entry by police officers into a home when consent to enter has already been granted to an undercover officer or informant who has observed contraband in plain view." *Pearson v. Callahan*, 555 U.S. 223, 229 (2009). At the time of the seizure that led to the alleged Fourth

---

[39] *See id.* ("However, I need not decide whether the officers violated Fish's constitutional rights by crossing into the sunroom before he had given explicit permission. The officers, in entering the sunroom, were at least entitled to qualified immunity.").

[40] *See, e.g.*, N.D. Fla. doc. no. 41-3 (Affidavit of Tyler Harrison), ¶ 5 ("Assuming this was the manner in which individuals entered and exited the residence, Deputy Loucks and I followed Ms. Riesco.").

Amendment violation in *Pearson*, only courts from a few federal Circuits (not including the Circuit in which the case arose) had considered the doctrine, but all courts that *had* considered it had adopted it. *Id.* at 244. In the absence of law from their own Circuit, the officers who conducted the seizure were entitled to rely upon cases from other Circuits that allowed the "consent-once-removed" doctrine; and, accordingly, they were entitled to qualified immunity. *Id.* at 244-45. This court does not appear to have addressed the "consent-once-removed" doctrine after the Supreme Court's 2009 decision in *Pearson*. Therefore, the doctrine is no more settled today than it was in 2009. Thus, if the Deputies were entitled to rely upon the doctrine in *Pearson*, they also were entitled to rely upon it here.

Second, the Deputies reasonably could have believed that the sunroom was "impliedly open to use by the public" for the purpose of gaining access to the principal, interior areas of the house. *Coffin v. Brandau*, 642 F.3d 999, 1012 (11th Cir. 2011) (quoting 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.3(c) (4th ed. 2004)). *See also, e.g.*, *United States v. Garcia*, 997 F.2d 1273, 1279-80 (9th Cir. 1993) ("If the front and back of a residence are readily accessible from a public place, like the driveway or parking area here, the Fourth Amendment is not implicated when officers go to the back door reasonably believing it is used as a principal entrance to the dwelling.").

22

Stated differently, Deputies Harrison and Loucks reasonably could have believed under the circumstances of this case that their entry into the sunroom was lawful. *See Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) ("[A] police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law and the information possessed by the officer at the time the conduct occurred.") (citing *Stewart v. Baldwin County Bd. of Education*, 908 F.2d 1499, 1503 (11th Cir. 1990)) (alteration supplied).

In summary, the law was not sufficiently clearly established at the time of the alleged violation to give Harrison and Loucks fair warning that their entry into Fish's sunroom under the circumstances of this case would violate his Fourth Amendment rights. *See Carroll v. Carman*, — U.S. —, 135 S. Ct. 348, 349 (2014) (holding that police officers should have been entitled to qualified immunity when they entered onto a ground-level deck on the back of a home to knock on a sliding-glass door, believing the door to be a "customary entryway").

2.      **Entry into the residence from the sunroom**

The district court also correctly found that Harrison and Loucks were entitled to qualified immunity on Fish's claim for unlawful entry into his home from the sunroom. Fish consented to the deputies' entry by responding "All right"

23

when Riesco said she had brought Harrison and Loucks with her "to watch so I don't steal nothing of yours, okay?"[41]  As the district court found, "[b]y responding affirmatively to Riesco's introduction of the officers, Fish gave what any reasonable person would have considered explicit verbal consent for the officers to enter his home."[42]

Plaintiff alternatively argues that if he is deemed to have given consent, his "consent" was not effective because it was prompted by a "show of official authority."[43]  *See United States v. Ramirez-Chilel*, 289 F.3d 744, 751 (11th Cir. 2002) ("A suspect does not consent to a search of his residence when his consent to the entry into his residence is prompted by a show of official authority.") (citing *United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986)).  Here, however, plaintiff's consent was not prompted by any showing of official authority

---

[41] DVD at 02:14 to 02:18.  Fish denies that he gave verbal consent *before* the deputies entered his home, but the audio statements recorded on the DVD produced by the dash camera mounted on Deputy Harrison's cruiser establish that he did so.  *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Beshers v. Harrison*, 495 F.3d 1260, 1262 n.1 (11th Cir. 2007) (refusing to adopt an appellant's version of facts when reviewing a district court's order granting summary judgment in favor of the defendant police officers on the issue of qualified immunity in an excessive force case because the appellant's factual allegations were "clearly contradicted" by videotape evidence "such that no reasonable jury could believe it").

[42] N.D. Fla. doc. no. 54 (Order), at 9 (alteration supplied); *see also id.* at 16-20.

[43] *See* Appellant's Brief, at 15.

24

by the Deputies.  Neither Harrison nor Loucks brandished his weapon, and neither demanded entry.   Instead, the Deputies simply followed Riesco inside after plaintiff said it was "All right."  *Cf Ramirez-Chilel*, 289 F.3d at 751 (finding that consent was not coerced by a show of official authority when the number of officers was small, their guns were not drawn, and the occupant of the home voluntarily yielded the right-of-way).

**B**.    **Unlawful Search and Seizure of Firearms**

The district court correctly found that Harrison and Loucks did not violate Fish's constitutional rights when they seized firearms within his home, because the firearms were in plain view.

> The "plain view" doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent.

*United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)); *United States v. Hromada*, 49 F.3d 685, 690 n. 11 (11th Cir. 1995)).

After lawfully entering Fish's home, Deputy Harrison almost immediately asked Fish where Riesco's belongings were located in the home:  "What all she got here?"  Fish responded that her property was located "in that drawer in there,"

25

indicating his bedroom.  Thus, Fish's consent to the officers' presence extended to the bedroom, where Harrison saw the revolver hanging from the bedpost, the guns under the bed, and a large quantity of ammunition openly displayed in an urn. That is so, regardless of exactly where Harrison was standing when he saw the weapons and ammunition, because Harrison had Fish's consent to enter the bedroom if he needed to so in order to fulfill his peacekeeping purpose, and he unquestionably would have seen those items once he was in the room.

Moreover, the incriminating nature of the weapons in Fish's bedroom was immediately apparent.  Harrison was familiar with the standard terms of the pre-printed domestic violence injunctions normally entered by the courts in Florida's Fourteenth Judicial Circuit, and knew that they explicitly prohibited Fish's mere possession of firearms and ammunition.  Additionally, when Harrison directly asked Fish if he still had an injunction against him, Fish's immediate, defensive response of "Those aren't mine!" could have led a reasonable officer to conclude that Fish was acknowledging the existence of the injunction, as well as the presence of multiple firearms in his bedroom.[44]

---

[44] Fish asserts that the Deputies were required by Florida law to independently verify the accuracy of the information about the injunction by running an official check of his record before coming to his house, or at least before searching for weapons.  That assertion holds no water here, however, because "[t]here is no federal right not to be arrested in violation of state law."

## C. Unlawful Arrest

Finally, the district court correctly found that defendants had at least arguable probable cause to arrest Fish. An arrest is unreasonable and, therefore, violates the Fourth Amendment, when it is not supported by probable cause. *See, e.g.*, *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). "Probable cause is defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Id*. (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).

Even if an officer has effected an arrest without probable cause (and without a warrant), he still will be entitled to qualified immunity if the arrest was supported by *arguable* probable cause. *See Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) ("Qualified immunity applies when there was *arguable* probable cause for an arrest even if *actual* probable cause did not exist.") (emphasis supplied) (citing *Jones v. Cannon*, 174 F.3d 1271, 1283 n. 3 (11th Cir. 1999)); *Cottrell v. Caldwell,* 85 F.3d 1480, 1485 n.1 (11th Cir. 1996) ("[W]hen the claim is that a search and seizure or arrest violated the Fourth Amendment, qualified immunity depends upon whether arguable probable cause existed.") (alteration

---

*Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002) (alteration supplied) (citations omitted).

supplied).    "*Arguable* probable cause exists if, under all of the facts and circumstances, an officer reasonably *could* — not necessarily *would* — have believed that probable cause was present."  *Crosby*, 394 F.3d at 1332 (emphasis supplied).

Fish was arrested for the offenses of possessing firearms and ammunition in violation of a domestic violence injunction  (Fla. Stat. § 790.233(1)), and resisting an officer without violence to his or her person (Fla. Stat. § 843.02). The first statute states that "[a] person may not have in his or her care, custody, possession, or control any firearm or ammunition if the person has been issued a final injunction that is currently in force and effect, restraining that person from committing acts of domestic violence."   Fla. Stat. § 790.233(1) (alteration supplied).    Because Harrison and Loucks had adequate knowledge of the injunction, and they lawfully viewed the firearms and ammunition in Fish's residence, it is clear that they had, at the very least, arguable probable cause to arrest him for that offense.   It is not necessary to consider whether there was arguable probable cause to arrest for the second offense, because "[i]f the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply." *Brown v. City of Huntsville*, 608 F.3d 724, 735 (11th Cir. 2010) (citing

*Skop v. City of Atlanta*, 485 F.3d 1130, 1137-38 (11th Cir. 2007)) (alteration supplied).

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's decision to grant summary judgment on Fish's federal claims and to remand his supplemental state-law claims to the state court from which they were removed.

**AFFIRMED.**