[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14257

_____

D.C. Docket No. 2:14-cv-01886-MHH

CALVIN LEE ROBINSON,

Plaintiff - Appellant,

versus

L. B. RANKIN,
Officer,
TODD EASTERWOOD,
Officer,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(May 13, 2020)

Before ED CARNES, Chief Judge, ROSENBAUM, Circuit Judge, and VINSON,[*] District Judge.

PER CURIAM:

Following what they believed to be a drug transaction, two police officers, Todd Easterwood and Loyce Brent Rankin, attempted to detain Isaiah Brown, whom they suspected to be a drug dealer, by using a police vehicle to block Brown's car, a Mazda Millenia. The situation quickly escalated, and Easterwood ended up firing six shots. One of the bullets hit Calvin Robinson, Jr., who was a passenger in the Mazda. Robinson died soon after from his injuries.

Calvin Robinson, Sr., Robinson Jr.'s father, filed this civil suit against Easterwood and Rankin. The district court concluded that both officers were entitled to immunity and granted their motion for summary judgment. More specifically, the district court determined that Easterwood was entitled to qualified immunity because each of the six shots he fired was justified.

We cannot reach the same conclusion about the third and fourth bullets that Easterwood fired. The officer admitted that he was specifically targeting Robinson, the passenger, when he fired those rounds. And while he claims that Robinson was reaching for a gun at that time, that contention is disputed. So we must assume for summary-judgment purposes that the version more favorable to Robinson's

---

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

representative in this litigation, Robinson, Sr., is correct, and that Easterwood targeted and shot at an unarmed, non-threatening passenger. We have little trouble concluding that, under that fact pattern, the officer was not entitled to qualified immunity at this stage.

For the reasons set forth below, we reverse the district court's grant of qualified immunity to Easterwood. For the same reasons, we also reverse the district court's grant of state-based immunity to Easterwood. We do, however, affirm the district court's grant of state-based immunity to Rankin.

## I.

## A.

On the morning of August 22, 2012, Brown was driving around his Brighton, Alabama, neighborhood in his 1999 Mazda Millenia when he saw his friend and neighbor, Robinson, walking down the block. The two men had been friends since they were children, and Brown offered Robinson a ride so he wouldn't have to walk. Brown and Robinson spent the morning together before Brown got a call from a woman named Lauren Foust, who wanted to purchase heroin from him.

In response to Foust's inquiry, Brown arranged a meeting with her for later that day. Robinson went with him, and Brown sold to Foust $20 to $40's worth of heroin.

That same morning, Officers Easterwood and Rankin were on duty nearby. They were members of the United Narcotics Investigations Task Force and were working that day as plain-clothed officers. From their vehicle, an unmarked silver Chevrolet Malibu, the officers saw a 1996 Ford Explorer parked in the lot of an abandoned store. Easterwood recognized the vehicle from a broken driver's side window and tow numbers on the rear window and believed it belonged to Foust, whom Easterwood knew to be a drug user.

From the Malibu, the officers observed Foust make several quick calls and look around. They suspected she may be negotiating a drug deal and decided to follow her.

After trailing Foust for a few minutes, the officers saw the Explorer turn north onto Parker Springs Street. The officers went down a different street to evade detection, made a few turns, and headed south on Parker Springs Street. As they did, they drove past Hardy Street.[1]

---

[1] The map below shows the intersection of Parker Springs Street and Hardy Street. Hardy Street has since been renamed as Short Blockton Avenue. We take judicial notice of the changed name. *See* Fed. R. Evid. 201(b)(2). But because the street was called "Hardy Street" in August 2012, we use that name in this opinion.

4

Easterwood later testified that, while he was still in the Malibu on Parker Springs Street, he saw Foust's Explorer on Hardy Street, facing west, away from the Parker Springs Street-Hardy Street intersection. Next to it was a black car that was facing east, towards the police and the Parker Springs Street-Hardy Street intersection. Rankin believed he had previously seen the black car—which was Brown's Mazda—fleeing from a hand-to-hand drug transaction. At the time the officers saw Brown's Mazda and Foust's Explorer on Hardy Street on August 22, 2012, the drivers' windows were lined up next to each other, and Easterwood observed what appeared to be a hand-to-hand exchange between the windows.

As the police discussed what to do next, Foust and Brown parted ways. Each driver went straight ahead, so Brown was approaching Parker Springs Street and the police. Rankin, who was driving the Malibu, turned his vehicle around and drove into the Hardy Street and Parker Springs Street intersection to cut off Brown's route.



Much of what happened next is in dispute.  According to Brown, as he drove the Mazda into the intersection, the Malibu suddenly cut him off, and two armed men jumped out of the vehicle.  Brown later said that he did not recognize that the "two old white guys out running with guns" were police officers.  ECF No. 66-1 at 129–30.[2]  The Malibu was unmarked and, according to Brown, the police did not initially activate the car's siren or blue lights (though Brown acknowledged that the lights were activated before he tried to get away).  Brown thought that someone was trying to rob him and Robinson.  Fearing for their safety, Brown tried to drive his car away.

Easterwood had a different recollection of the officers' initial interaction with Brown and Robinson.  He testified that Rankin turned on the Malibu's blue lights and siren before driving into the intersection and that both officers had their badges and guns drawn as they got out of their car.  Rankin also said that his lights and siren had been on, and that as he advanced towards the Mazda, he saw Robinson put up his hands.

But then Brown tried to get away.  As he did so, his car came close to Easterwood.  It is difficult from this record to pinpoint Easterwood's precise location in relation to the Mazda.  Brown's own account is less than clear:  he testified that

---

[2] Citations to "ECF No." in this opinion are citations to the electronic case-filing numbers listed in the docket sheet of *Robinson v. Hueytown Police Department*, Case No. 2:14-cv-01886-MHH (N.D. Ala.).

no one was ever "in front of the car," *id.* at 106, but also that "[y]ou can say to the front.  He's more to the side."  *Id.* at 107.  Easterwood, for his part, thought that Brown was "attempting to flee and kill [Easterwood.]"  ECF No. 48-2 at 28.

Easterwood fired two rounds "[i]n order to stop the vehicle."  *Id.* at 17.  These shots were aimed at Brown.  The Mazda slowed and veered to its left, but it did not stop.

At this point, Easterwood was standing somewhere to the right of the vehicle, and from his position, he could see Robinson through the passenger window.  Easterwood later claimed that he witnessed Robinson reach for a stainless-steel gun that was on the console between the Mazda's front seats.  So Easterwood fired two more shots—this time at Robinson.  Indeed, Easterwood testified that he was trying to hit Robinson.  *See id.* at 18–19.

After the episode was over, the officers found a gun in the Mazda.  Brown admitted that the gun was his and said that he had put it in the car the previous night for "protection," because he was going to a party.  He claimed that he had placed the gun between the console and one of the front seats, not on the console.  And according to Brown, the officers became aware of the gun only once Brown told them about it—after he was pulled from the Mazda when the entire episode ended.  Brown was adamant that neither he nor Robinson touched, or tried to touch, the gun

7

at any point during the stop: "There wasn't no gun pulled out, period." ECF No. 66-1 at 70.[3]

Foust corroborated Brown's account in a sworn affidavit. From her Explorer, Foust could see down and into Brown's Mazda during the drug exchange. From that vantage point she did not see a gun on the Mazda's console or anywhere else. Foust explained her memory of this non-event by adding that she is "very fearful of guns and would have visibly reacted to the sight of any handgun." ECF No. 49-7.

The officers remembered things differently. Easterwood, of course, said that he saw a gun on the console as the Mazda was moving past him. And Rankin testified that he saw a gun shortly after he got out of the Malibu and was approaching the Mazda, and then later saw it on the console as he was taking Brown out of the vehicle.

---

[3] Brown provided a consistent account to the Alabama Bureau of Investigation ("ABI"), which conducted its own investigation in this case. In an interview with the ABI on August 22, 2012, Brown said that the gun had been between the passenger seat and the console but said, "you couldn't even tell it was there." ECF No. 47-7 at 5. He was once again insistent that Robinson "never grabbed [the gun]," adding that Robinson "ain't like that." *Id.* at 4, 13.

Easterwood also provided a consistent account to the ABI. In a statement dated August 23, 2012, the officer explained that he fired these two rounds, the third and fourth shots he fired, because he saw Robinson "look[] at me and grab the silver gun on the console" and because Easterwood "feared that [Robinson] was going to shoot myself, Sgt. Rankin and/or the general public in his attempt to flee." ECF No. 47-2 at 2.

Turning back to the shooting, the Mazda continued to move after Easterwood fired the two shots at Robinson.  Fearing that the vehicle still presented a danger, Easterwood fired two more shots.  The car finally stopped.

The officers approached the Mazda.  Brown had been shot in the leg and the back of his arm.  Rankin took Brown out of the vehicle and put him on the ground, making a tourniquet out of a shirt to stop Brown's bleeding.  He then took the gun and placed it at Easterwood's feet.

Easterwood ordered Robinson to show his hands.  Robinson couldn't cooperate.  One of the shots Easterwood fired had hit Robinson.  He died before the paramedics arrived.  The cause of his death was a bullet wound to his aorta and lungs.

**B.**

The plaintiff in this case—Robinson's father, Calvin Robinson, Sr., on behalf of Robinson's estate—originally filed a lawsuit on August 21, 2014, in Alabama state court.  After the case was removed to federal court, Robinson, Sr., filed the operative complaint and named Easterwood and Rankin as defendants.[4]  He alleged

---

[4] In addition to Rankin and Easterwood, Robinson, Sr., originally named as defendants the City of Hueytown Police Department, Hueytown Police Chief Chuck Hagler, and multiple unnamed defendants who may have contributed to Robinson's death.  The defendants removed the case to federal court.  In response to a motion to dismiss, Robinson, Sr., filed an amended complaint, naming the same individuals, along with the City of Hueytown, as defendants.  The defendants again moved to dismiss, and the district court dismissed with prejudice the claims

claims against Easterwood of excessive force under the Fourth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983. In addition, Robinson, Sr., asserted against both officers a wrongful-death claim under Alabama law. Regarding these Alabama state-law claims, Robinson, Sr., alleged that Easterwood "shot[] Robinson, Jr.[,] when no one was threatened with serious physical harm and Easterwood could not have been reasonably perceived to be in imminent danger." ECF No. 37 at ¶ 13. And Robinson, Sr., asserted that Rankin wrongfully caused Robinson's death by "deviat[ing] from his police training and the rules and regulations of the Hueytown Police Department to such an extent that Rankin cannot be said to have been acting within the line and scope of his employment as a police officer." *Id.* at ¶ 25.

The officers answered on May 16, 2016. Along with other affirmative defenses, Easterwood claimed that he was entitled to qualified immunity, and both officers invoked state-based immunity.

Following discovery, the officers moved for summary judgment. The district court granted their motion. *See Robinson v. Rankin*, No. 2:14-cv-01886-MHH, 2018 WL 4621823 (N.D. Ala. Sept. 26, 2018).

---

against the City of Hueytown, Chief Hagler, and the unnamed defendants, as well as the § 1983 claims against Easterwood and Robinson that were based on the Fourteenth Amendment. *See Robinson v. City of Hueytown*, No. 2:14-cv-01886-MHH, 2015 WL 5719144, at *7 (N.D. Ala. Sept. 30, 2015). Robinson, Sr., does not challenge the district court's dismissal of those claims. The remaining claims against Easterwood and Rankin survived. *See id.* at *3, *6.

Regarding the § 1983 claim, the district court accepted, for summary-judgment purposes, Brown's account that Robinson did not reach for the gun. *See id.* at *4 n.4. Because this fact was in dispute, the district court did not credit Easterwood's explanation that he shot at Robinson out of fear that Robinson was trying to shoot him. *See id.* at *11 n.9. Nevertheless, the district court concluded that Easterwood was entitled to qualified immunity for this claim because he reasonably assessed that Brown was trying to run him over with the Mazda. *See id.* at *10–*11. Even though the Mazda had passed Easterwood before he fired the final four shots, the district court concluded that "[i]t was not clear that the threat Officer Easterwood had recognized seconds before had abated." *Id.* at *11.

The district court also granted summary judgment on Robinson, Sr.'s wrongful-death claims. In doing so, the court rejected the wrongful-death claim against Easterwood for the same reasons it held against Robinson, Sr., on the § 1983 claim. *See id.* at *13. And it rejected the wrongful-death claim against Rankin— which was the only claim alleged against him—because Robinson, Sr., failed to identify a rule or regulation that Rankin had violated. *See id.*

Robinson, Sr., filed a timely notice of appeal.

## II.

We review *de novo* a district court's grant of summary judgment based on qualified immunity. *See Draper v. Reynolds*, 369 F.3d 1270, 1274 (11th Cir. 2004),

11

*cert. denied*, 543 U.S. 988 (2004).  As with any summary-judgment case, we view all evidence and factual inferences in the light most favorable to the non-moving party, which in this case is Robinson, Sr.  *See Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003), *cert. denied*, 543 U.S. 917 (2004).  We likewise "resolve all issues of material fact" in Robinson, Sr.'s favor.  *Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016) (citation and quotation marks omitted).

## III.

We have frequently recognized the critical and dangerous job that police officers perform in keeping the peace and maintaining order.  For that reason, police officers sued in their individual capacities enjoy "complete protection" from suit if their actions do not violate clearly established statutory or constitutional rights.  *Oliver v. Fiorino*, 586 F.3d 898, 904 (11th Cir. 2009) (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009)).  Indeed, we have recognized that qualified immunity exists "to allow officials to carry out discretionary duties without the chilling fear of personal liability or harrassive litigation, 'protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'"  *McCullough*, 559 F.3d at 1205 (citing *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987) and quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).

But the law does not protect officers who "knew or reasonably should have known" that their official conduct would violate the clearly established rights of the

12

plaintiff. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (internal quotation marks and alteration omitted). This is an objective inquiry, and we make it based on the law as it existed when the conduct occurred. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) ("If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.").

To be eligible for qualified immunity, officers must show that they were acting within the scope of their discretionary authority when the challenged actions happened. *See Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). Here, it is uncontested, and indisputable, that Easterwood was acting within the scope of his discretionary authority when he opened fire at the Mazda. *See Hunter v. Leeds, City of*, 941 F.3d 1265, 1278 n.16 (11th Cir. 2019) ("The pursuit and apprehension of suspected criminals is a core discretionary function of the police.").

Once a police officer has established that the conduct at issue may fall under the doctrine's umbrella, the burden shifts to the plaintiff to show that the grant of qualified immunity is inappropriate. *See Lee*, 284 F.3d at 1194. To do so, the plaintiff must satisfy two requirements. The plaintiff must first show that the officer's conduct violated a constitutional right. *See Fish v. Brown*, 838 F.3d 1153, 1162 (11th Cir. 2016). Second, the plaintiff must show that the violated right was "clearly established" at the time of the incident. *See id.* In determining whether the

13

right was clearly established we look to the precedent of the Supreme Court of the United States, our precedent, and, because the shooting took place in Alabama, the precedent of the Alabama Supreme Court. *See Oliver*, 586 F.3d at 907.

## A. Genuine issues of material fact prevent us from determining whether Robinson's actions justified Easterwood's deadly force

Citing to our *de novo* review, Easterwood invites us to put aside the district court's determination that a material dispute exists as to whether Easterwood saw Robinson reaching for a gun, and to decide for ourselves that Easterwood's account is correct. If we were to accept Easterwood's invitation, that would be the end of the case. For it is well established that a police officer commits no constitutional violation by shooting at a suspect who poses an immediate threat of danger to the police or to the public. *See, e.g.*, *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (granting qualified immunity to officer who shot a suspect who was "armed and posed a threat of serious physical injury"); *Willingham v. Loughnan*, 321 F.3d 1299, 1304 (11th Cir. 2003) (granting qualified immunity to officer who shot suspect "within a 'split second' after she attempted to kill one officer and assaulted another."), *cert. denied*, 540 U.S. 816 (2003); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) (per curiam) ("[T]he Constitution . . . permit[s] the use of deadly force against a suspect who poses . . . an imminent threat of danger to a police officer or others.").

14

Perhaps Easterwood's story will ultimately bear out, or perhaps it will not. But we are unable to reach a conclusion one way or the other at this stage. Multiple, irreconcilable accounts exist concerning what happened on August 22, 2012.

Easterwood and Rankin both claimed after the fact that they saw a gun in the Mazda. Perhaps they are telling the truth. But a reasonable jury could conclude otherwise on the record here. Brown stated, both to the Alabama Bureau of Investigation and at his deposition, that the gun remained at all times between the Mazda's console and one of the front seats, out of the officers' vision. And Brown also said that the officers did not know about the gun until he told them about it— after he was pulled from the Mazda. Foust likewise stated that she did not see a gun.

Easterwood retorts that according to Brown's testimony, he was looking away from Robinson when the shooting started, so Brown could not testify as to what Robinson was doing at that moment. Based on this testimony, Easterwood asks that we fill in the hole in Brown's story by crediting Easterwood's account.

We decline to do so. Even if we were to agree with Easterwood that Brown did not know exactly what was unfolding in his car, we could not conclude from this record that Robinson was, at the moment Brown looked away, reaching for a weapon. There is no evidence to support that beyond Easterwood's version of the story, and as we have noted, Brown's recollection contradicts Easterwood's. We will not assume the jury's role and simply credit Easterwood's story over the rest of

15

the evidence; rather, on summary judgment, we are required to assume facts in the light most favorable to Robinson, Sr. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1143 (11th Cir. 2007) ("In reviewing the grant of qualified immunity at summary judgment, we are required to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant.") (citation and quotation marks omitted); *see also Tolan v. Cotton*, 572 U.S. 650, 659 (2014) (per curiam) (cautioning courts against "credit[ing] the evidence of the party seeking summary judgment and fail[ing] properly to acknowledge key evidence offered by the party opposing that motion.").

This case features two police officers who have provided their accounts of a key moment during an altercation. Another participant in the events at issue has provided a different, conflicting version of what happened. Each account is plausible, but at least one is false. We offer no opinion as to which one that may be. That is the jury's purview, not ours. Instead, we must assume for these purposes that Brown's account is the accurate one, as it presents facts more favorable to Robinson, Sr. For that reason, we must assume that Robinson was unarmed and was not reaching for a firearm at the time Easterwood shot him.

**B. Easterwood's targeting of an unarmed passenger amounted to unconstitutional deadly force**

16

We turn now to Robinson, Sr.'s, § 1983 claim:  that Easterwood violated Robinson's Fourth Amendment right to be free from excessive force by shooting him on August 22, 2012.  The Fourth Amendment protects against "unreasonable searches and seizures."  U.S. Const. amend. IV.  Where an officer is attempting to stop and apprehend a suspect, this protection "includes the right to be free from the use of excessive force."  *Saunders v. Duke*, 766 F.3d 1262, 1266–67 (11th Cir. 2014).[5]

The touchstone of our qualified-immunity inquiry requires us to consider whether "an objectively reasonable officer in the same situation could have believed that the force used was not excessive."  *Vinyard*, 311 F.3d at 1346; *see also Graham v. Connor*, 490 U.S. 386, 388 (1989).  We do not account for police officers' subjective intent or motivation when we conduct our analysis.  *See Crosby v. Monroe Cty.*, 394 F.3d 1328, 1333 (11th Cir. 2004).

Nor do we expect police officers to be clairvoyant.  Rather, we recognize that police officers often must make quick judgments about the amount of force a situation requires—frequently in difficult and quickly changing circumstances.  *See Menuel v. City of Atlanta*, 25 F.3d 990, 996 (11th Cir. 1994) (quoting *Graham*, 490

---

[5] Easterwood's conduct implicated the Fourth Amendment, as "apprehension by the use of deadly force" has long been considered a "seizure."  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *see also Carr v. Tatangelo*, 338 F.3d 1259, 1268 (11th Cir. 2003), *as amended* (Sept. 29, 2003) ("Although Carr was not immediately stopped by the bullet from Officer Fortson's gun, he nevertheless was seized within the meaning of the Fourth Amendment when the bullet struck or contacted him.").

U.S. at 396–97). We therefore do not engage in Monday-morning quarterbacking. Rather, we analyze the claim "from the perspective of a reasonable officer on the scene." *Id.* (citation and quotation marks omitted); *see also McCullough*, 559 F.3d at 1206 ("In determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate."). So police officers may be entitled to qualified immunity where, based on the information they possessed at the time, they reasonably could have believed that probable cause supported the use of deadly force—even if their belief was wrong. *See Jean-Baptiste*, 627 F.3d at 821.

Our analysis must necessarily be fact specific. *See McCullough*, 559 F.3d at 1206. In cases involving the use of deadly force, we have distilled three "key factors" to guide us. *Terrell v. Smith*, 668 F.3d 1244, 1251 (11th Cir. 2012). We have explained that, under the Fourth Amendment, an officer's use of deadly force is "reasonable" when an officer "(1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly

18

force, if feasible." *Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)) (emphasis in *Vaughan* and internal quotation marks omitted).

Because we cannot determine from this record which bullet killed Robinson, we examine the reasonableness of each shot that Easterwood fired. For the purposes of our analysis, we group these into three sets of two shots.

Easterwood claimed that he fired the first set of shots—the first and second rounds that he discharged—as the Mazda was coming at him and when it appeared that Brown was "attempting to flee and kill [Easterwood]." ECF No. 48-2 at 28. Easterwood testified that he fired these shots "to stop the vehicle." *Id.* at 17.

This scenario does not represent a unique fact pattern in our Circuit. In cases involving a suspect using or threatening to use a vehicle as a weapon against police officers or civilians, we have "consistently upheld an officer's use of force and granted qualified immunity." *McCullough*, 559 F.3d at 1207; *see also Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005) (deadly force was justified where the officer "was standing in a narrow space between the two vehicles, [the driver] was disobeying [the officer's] orders to put his hands up, the [vehicle] was suddenly moving forward and [the officer] had to make a split-second decision of whether he could escape before he got crushed."), *cert. denied*, 546 U.S. 1109 (2006); *Terrell*, 668 F.3d at 1254 (deadly force justified where an officer "pursued [the suspect] in

19

order to arrest him and clearly instructed him to stop the car. Instead of complying with [the officer's] orders, [the suspect] attempted to turn the car in a manner that caused it to strike the officer.").

We reach the same conclusion here. Easterwood had probable cause to believe that Brown posed a threat of serious physical harm and reasonably concluded that deadly force was necessary. *See Troupe v. Sarasota Cty., Fla.*, 419 F.3d 1160, 1168 (11th Cir. 2005), *cert. denied*, 547 U.S. 1112 (2006); *Arrugueta*, 415 F.3d at 1256. And while some dispute remains about precisely when the officers activated the Malibu's sirens and blue lights, it is clear from Brown's own account that the lights were on by the time he tried to drive away. So the first and second shots that Easterwood fired were reasonable under our jurisprudence. *See Vaughan*, 343 F.3d at 1329–30.[6]

We likewise conclude that Easterwood did not act unreasonably under our precedent when he fired the final set of shots—the fifth and sixth rounds. Easterwood shot at the Mazda as the car drove away from him because he believed that it continued to present a danger to him or to others.

---

[6] At oral argument, Robinson's counsel agreed that he didn't "have any problem" with the first two shots. Oral Argument at 2:12, *Calvin Robinson v. L.B. Rankin, et al.* (No. 18-14257), http://www.ca11.uscourts.gov/oral-argument-recordings?title=&field_oar_case_name_value= rankin&field_oral_argument_date_value%5Bvalue%5D%5Byear%5D=&field_oral_argument_d ate_value%5Bvalue%5D%5Bmonth%5D= ("Oral Argument").

We have never held that an officer is unjustified in shooting at a vehicle that is being used as a weapon simply because the officer is no longer in the vehicle's path. To the contrary, we have held that deadly force may be permissible where an officer "perceive[s] that [the driver is] attempting to escape and could potentially endanger more lives." *Troupe*, 419 F.3d at 1168–69; *see also Pace v. Capobianco*, 283 F.3d 1275, 1280 n.12 (11th Cir. 2002) ("[U]nder the law, the threat of danger to be assessed is not just the threat to officers at the moment, but also to the officers and other persons if the chase went on.").

We addressed a similar issue in *McCullough*. There, the police cornered McCullough in a parking lot after a high-speed chase. McCullough then ignored officers' warnings, refused to show his hands, and drove his truck towards a deputy before trying to escape. *See McCullough*, 559 F.3d at 1207–08. We concluded that the officers reasonably believed that McCullough "used his vehicle in a dangerous and aggressive manner which provided the officers with probable cause to believe that McCullough, while driving his truck, posed a threat of serious physical harm or death to the officers, or other passersby," and thus "provided the officers with sufficient reason to believe the use of deadly force was necessary." *Id*. at 1208.

Though the facts of this case are not as extreme as those in *McCullough*, similarities exist. A reasonable officer could have perceived that Brown and the Mazda presented a threat, even after Easterwood had shot at it four times. Brown,

21

who had already—to a reasonable officer—tried to use the vehicle as a weapon was far from fully secured. The Mazda had not stopped. Brown was turning it away from the officers and moving past their vehicle. Had he succeeded, there would have been nothing to stop Brown from escaping through a residential neighborhood, putting others at risk. It was not unreasonable for Easterwood to try to prevent this.

That leaves us with the second set of shots that Easterwood fired—the third and fourth rounds. Unlike the first and final sets, these shots were not targeted at Brown or at the vehicle. Rather, Easterwood himself stated that he was aiming at Robinson when he fired these shots. And as we have noted, when we analyze these shots, we must assume that Robinson was unarmed at the time and was neither reaching for a weapon nor otherwise, himself, presenting a threat to the officers or the public.

We once again are not writing on a clean slate, as the Supreme Court has already held that the use of deadly force against an unarmed, non-threatening suspect is constitutionally unreasonable. In *Garner*, police responded to a 911 call and were told that a woman heard glass shattering and someone breaking into her neighbor's home. 471 U.S. at 3. One officer went into the neighbor's backyard and saw an individual run from the back door of the house and stop at a fence. *Id*. at 3. The officer could see the suspect's hands and face and did not believe he was armed. *Id*. When the officer yelled at the suspect to halt, the suspect instead started climbing

22

the fence.  *Id.* at 4.  Rather than risk allowing the suspect to escape, the officer shot and killed him.  *Id.*  The Supreme Court held that this was not constitutionally reasonable force.  *See id.* at 11.  In reaching this conclusion, the Supreme Court explained that "[w]here the suspect poses no immediate threat to the officer and no threat to others," the use of lethal force is not justified.  *Id.*

We have little trouble concluding, under these circumstances, that Easterwood's shots directly at Robinson were likewise not reasonable.  True, Robinson was in a car that someone else was trying to use as a weapon.  But in this scenario, Robinson himself never presented a threat to the officers or anyone else.  He was not in control of the car, he was unarmed, and he presented no other threat.  Nor would killing Robinson stop the car that did present the threat.

The logic behind our "consistently up[holding]" the use of lethal force against a suspect using a vehicle as a weapon against officers or civilians is obvious:  a car is a powerful machine that can easily maim or kill a human being.  By incapacitating or killing the driver, the officer has a better chance of escaping injury and reducing the harm that the driver might cause.  *See Troupe*, 419 F.3d at 1168–69, 1169 n.8 (deadly force upheld and qualified immunity granted where officers shot at a driver who was trying to escape police and get past a police roadblock, and where the officer knew that other police officers "were only a short distance away" and "that citizens could be on the main street and could be harmed."); *Pace*, 283 F.3d at 1277–

23

78, 1281 (deadly force upheld and qualified immunity granted where the suspect, who was driving a car, "would have appeared to reasonable police officers to have been gravely dangerous" because the driver led the police in a "high-speed chase" at night (without his headlights on) through someone's front yard and down the wrong side of the road (nearly colliding with an elderly motorist) and, when finally cornered in a dead-end cul-de-sac, ignored the officers' warnings and tried to escape).

This rationale obviously does not logically extend to targeting a passenger. Even if Easterwood had been successful and hit Robinson—and it seems that he may have been[7]—the threat from Brown and the vehicle would remain. An unarmed passenger does not control a driver who is using a car as a weapon; indeed, the driver can harm an officer or the public even with a dead or wounded passenger in the car.

Based on this record, we must conclude that Easterwood violated Robinson's Fourth Amendment rights when Easterwood deliberately shot at Robinson even though Robinson was unarmed and presented no threat.

## C. The law had clearly established at the time of Easterwood's shots targeting Robinson that Easterwood's deadly force was unconstitutional

---

[7] It may be that Easterwood fired the bullet that killed Robinson during his first or final sets of shots. At oral argument, his counsel conceded that "there really was no evidence before the district court regarding which shot hit." Oral Argument at 23:15. Construing the facts as we must, we assume for these purposes that either the third or fourth shot that Easterwood fired killed Robinson.

24

Having determined that Easterwood violated the Fourth Amendment by targeting and shooting at an unarmed passenger, we now consider whether the right to be free from such an excessive use of force was clearly established as of August 22, 2012. We conclude that it was.

A right is "clearly established" when its outer limits are adequately defined such that a reasonable officer would know that his actions transgress that right. *See Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). To satisfy this test, the law must have provided "real notice of practical value to government officials, considering the specific circumstances confronting them, and not just talk of some generalized, abstract intellectual concept," that the officer's conduct violated a clearly established right. *Pace*, 283 F.3d at 1282.

We have recognized three ways a plaintiff can show that a constitutional right was clearly established. First, a plaintiff can point to a materially similar case where we, the Supreme Court, or the relevant state's high court previously decided that the conduct at issue was unlawful. *See Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013). Under this method, a plaintiff need not identify a case on all fours with the current one, but case law must have "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Second, a plaintiff can point to a "broader, clearly established principle [that] should control the novel facts in [the plaintiff's] situation." *Morton*, 707 F.3d at 1282 (quoting

25

*Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)) (first alteration in *Morton*). And finally, a plaintiff can argue that the conduct at issue "lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Lee*, 284 F.3d at 1199 (citation and quotation marks omitted).

We need not explore whether the second and third methods would apply to this case because our precedent provides us with a case "materially similar" to this one. *See Corbitt*, 929 F.3d at 1312. In *Vaughan*, we rejected a bid for qualified immunity where an officer opened fire at the driver and passenger of a stolen vehicle during a highway chase. *See Vaughan*, 343 F.3d at 1326–27, 1329. Though the driver was speeding and dragging items that had fallen off the truck's trailer, we concluded that it was not clear that the officer had probable cause to believe the suspects posed a danger to others because there were open questions as to whether the driver had lost control of the car and whether the road ahead was clear of other motorists. *See id.* at 1330.

Our holding in *Vaughan* would have put a reasonable officer on notice that the police cannot use deadly force against a suspect who is in a car but is not using that car as a deadly weapon and where the suspect does not otherwise pose a risk to the officers or to the public. Applying that principle here, by August 22, 2012, it

26

was clearly established in this Circuit that Easterwood's conduct would have violated the Fourth Amendment.

Easterwood may still argue at trial that he fired at Robinson because Robinson was reaching for a gun. If the jury accepts that version of the event, the qualified-immunity analysis would change. *See id.* at 1333. But on this record, and assuming facts in the light most favorable to Robinson, Sr., we cannot conclude that Easterwood is entitled to qualified immunity for purposely aiming and firing at Robinson.

## D. Easterwood is not entitled to state immunity, but Rankin is

Robinson, Sr., also challenges the district court's grant of immunity to Easterwood and Rankin on Robinson, Sr.'s state-based wrongful-death claim. We affirm the district court's decision as to Rankin but reverse as to Easterwood.

Each officer asserts that he is entitled to two types of immunity for Robinson, Sr.'s state-law claims: state-agent immunity doctrine, derived from Alabama's common law, and discretionary-function immunity, pursuant to Section 6–5–338(a) of the Code of Alabama. We have previously explained that the state-agent immunity doctrine "protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1254 (11th Cir. 2010) (quoting *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002)). And Section 6–5–338(a) grants to "[e]very peace officer . . .

27

immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."

In 2000, the Alabama Supreme Court restated and articulated the scope of state-agent immunity. *See Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000). As relevant here, that court recognized that "[a] State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons." *Id.* (emphasis in original). That immunity is not absolute: the court also held that "a State agent *shall not* be immune from civil liability in his or her personal capacity (1) when the Constitution or laws of the United States . . . require otherwise; or (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.* (emphasis in original).

The Alabama Supreme Court later clarified that *Cranman's* restatement of state-agent immunity also "governs the determination of whether a peace officer is entitled to immunity under § 6–5–338(a)." *Ex parte City of Tuskegee*, 932 So. 2d 895, 904 (Ala. 2005); *see also Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 741 (11th Cir. 2010) ("*Cranman's* test for state-agent immunity governs whether law

28

enforcement officers are entitled to statutory, discretionary-function immunity under § 6–5–338(a).").   Thus, although these are separate doctrines, we can address them together for the purposes of our analysis.

As with qualified immunity, to invoke state-based immunity, an officer must first show that that the plaintiff's claims "arise from a function that would entitle [the officer] to immunity." *See Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003).  The parties do not dispute that the officers have satisfied this requirement, as Easterwood and Rankin were engaged in a discretionary function during the August 22, 2012, shooting.  *See Telfare v. City of Huntsville*, 841 So.2d 1222, 1228 (Ala. 2002) ("Generally, arrests and attempted arrests are classified as discretionary functions.").

Under Alabama's framework, the burden shifts to Robinson, Sr., to show that the officers are not entitled to immunity. *See Grider*, 618 F.3d at 1255.  We conclude that Robinson, Sr., has satisfied this burden with respect to Easterwood.  As we have already determined, interpreting the facts in Robinson, Sr.'s favor, Easterwood used excessive force in violation of the Fourth Amendment.  So under *Cranman*, he cannot benefit from Alabama's immunity doctrines because "the Constitution . . . require[s] otherwise." *Cranman*, 792 So. 2d at 405; *see also Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019) ("[S]tate-agent immunity do[es] not immunize the guards from liability under state law if they violated . . . constitutional rights.").

29

But as to Rankin, Robinson, Sr., has failed to meet his burden. Robinson, Sr., does not allege that Rankin shot Robinson. Rather, Robinson, Sr., bases his theory of Rankin's liability on Rankin's supposed failure to adhere to Hueytown Police Department rules during the encounter.

The Alabama Supreme Court has held that "[a] State agent acts beyond authority and is therefore not immune when he or she 'fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'" *Giambrone*, 874 So. 2d at 1052 (quoting *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000)) (second alteration in *Giambrone*). But *Giambrone*'s rule applies only when the defied regulation is sufficiently detailed that it "would remove a State agent's judgment in the performance of required acts." *Ex parte Spivey*, 846 So. 2d 322, 333 (Ala. 2002).

Robinson, Sr., argues that Rankin, who was driving the Malibu, violated Section X of Chapter 2.3 of the Hueytown Police Department Policies and Procedures—which prohibits a police officer from "boxing in" a suspect's car during a pursuit without authorization from the supervisor in charge of the pursuit—when Rankin cut off Brown's path of escape. He claims that Rankin should have instead stopped the Mazda from behind and ordered Brown and Robinson to exit.

Even assuming without deciding that Section X is the type of regulation contemplated by *Giambrone*, Robinson, Sr.'s argument necessarily fails. First, we

30

note that Rankin was the supervising officer in charge during the incident in question. So Section X permitted him to authorize the "boxing in" of Brown's car. And second, as Robinson, Sr., admits in his brief, "Rankin may not have been technically in pursuit of Brown's vehicle." Pl.'s Br. at 28. To the contrary, Rankin tried to block Brown from fleeing to *avoid* a pursuit. And while we can imagine good reasons to ban officers from cutting in front of a suspect during a chase, which Section X appears to do, we are aware of no rule in Alabama that requires the police to provide a suspect with an open path to escape.

Robinson, Sr., complains that "[e]verything about the stop was wrong," Pl.'s Br. at 28, but does not identify any other law, rule, or regulation that Rankin supposedly violated. So even if we were to agree that Rankin acted negligently in carrying out the stop, we would still have to conclude that Robinson, Sr., has failed to show that Rankin acted willfully, maliciously, fraudulently, in bad faith, or beyond his authority. For that reason, we affirm the district court's grant of state immunity to Rankin.

## IV.

Although a jury may ultimately credit Easterwood's story that he was defending himself when he opened fire at Robinson, we cannot do so on summary judgment. We reverse the district court's grant of qualified immunity and state-

31

based immunity to Easterwood.  We affirm the district court's grant of state-based immunity to Rankin.

**AFFIRMED IN PART; VACATED IN PART AND REMANDED.**